## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **SECURITY DATA SUPPLY, LLC,** | * | **CIVIL ACTION NO. 17-10578** |
| **SDS OF NEW ORLEANS, LLC, SDS** | * | |
| **OF BATON ROUGE, LLC, SDS OF** | * | |
| **MANDEVILLE, LLC, SDS OF** | * | **JUDGE FALLON** |
| **MONROE, LLC, SDS OF BOSSIER** | * | |
| **CITY, LLC, SDS OF DALLAS, LLC,** | * | |
| **SDS OF HOUSTON, LLC, SDS OF** | * | **MAGISTRATE ROBY** |
| **SAN ANTONIO, LLC, SDS OF** | * | |
| **JACKSON, LLC, SDS OF MOBILE,** | * | |
| **LLC, AND SDS OF CENTRAL TEXAS,** | * | |
| **LLC** | * | |
| | * | |
| **VERSUS** | * | |
| | * | |
| **NORTEK SECURITY AND CONTROL,** | * | |
| **LLC, WAVE ELECTRONICS, INC.** | * | |
| **AND EARNEST BERNARD** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## FIRST AMENDED AND RESTATED COMPLAINT

**NOW INTO COURT**, pursuant to Fed. Rules of Civ. Proc. Rule 15(a)(1), Plaintiffs, Security Data Supply, LLC, SDS of New Orleans, LLC, SDS of Baton Rouge, LLC, SDS of Mandeville, LLC, SDS of Monroe, LLC, SDS of Bossier City, LLC, SDS of Dallas, LLC, SDS of Houston, LLC, SDS of San Antonio, LLC, SDS of Jackson, LLC, SDS of Mobile, LLC, and SDS of Central Texas, LLC (collectively referred to as "SDS"), files this Amended and Restated Complaint against Nortek Security and Control, LLC, Wave Electronics, Inc. and Earnest Bernard, and allege the following:

## SUMMARY OF THE CASE

1. SDS brings this action under the antitrust laws of the United States and specifically, pursuant to the provisions of the Robinson-Patman Act, 15 U.S.C. §13, et. seq., and the Clayton Act, 15 U.S.C. §15, seeking treble damages, attorney's fees and other incidental relief based upon the defendants' predatory pricing and price discrimination practices ~i.e., secondary-line price discrimination - as hereinafter more fully and particularly described. As a result of these defendants' violations of the antitrust laws, SDS has suffered "antitrust injury" (a loss of business, sales and profits caused by said defendants' unlawful price discrimination) and "competitive injury" (the diversion of sales and profits from SDS to defendants' favored purchasers).

2. SDS also alleges state law based claims for violations of the Louisiana Unfair Trade Practices Act, the Texas Deceptive Trade Practices Act, the California Unfair Trade Practices Act, the California Unfair Competition Law, Corporate Bribery, and violation of the implied covenant of good faith and fair dealing. As a result of these violations, SDS has suffered significant damages and is entitled to recover damages, treble damages, attorneys' fees, litigation costs and penalties.

## PARTIES

**Security Data Supply – The Aggrieved Distributor**

3. Plaintiff, Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Louisiana. SDS's principal place of business is located at 421 North Florida Street, Covington, LA 70433.

4.  Security Data Supply, LLC is a wholesale distributor of CCTV, intrusion alarm systems, access control, fire alarms and home automation systems that distributes product, including, but not limited to, the "Nortek Products" which are subject to this action, to retailers and installers nationally via online sales and ten branches/franchises located throughout the southeastern portion of the United States.

5.  Plaintiff, SDS of New Orleans, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Louisiana.  SDS of New Orleans's principal place of business is located at 3204 48th Street, Metairie, LA 70001.

6.  Plaintiff, SDS of Baton Rouge, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Louisiana.  SDS of Baton Rouge's principal place of business is located at 10652 Alco Ave., Baton Rouge, LA 70816.

7.  Plaintiff, SDS of Mandeville, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Louisiana.  SDS of Mandeville's principal place of business is located at 530 Asbury Drive, Suite B, Mandeville, LA 70471.

8.  Plaintiff, SDS of Monroe, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Louisiana.  SDS of Monroe's principal place of business is located at 805 Drago Street, West Monroe, LA 71291.

9.  Plaintiff, SDS of Bossier City, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Louisiana.  SDS of Bossier City's principal place of business is located at 4004 Shed Road, Bossier City, LA 71111.

10. Plaintiff, SDS of Dallas, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Texas.  SDS of Dallas's principal place of business is located at 2225 East Beltline Road, Suite 205, Carrollton, TX 75006.

11. Plaintiff, SDS of Houston, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Texas.   SDS of Houston's principal place of business is located at 10202 Fairbanks N. Houston, Houston, TX 77064.

12. Plaintiff, SDS of San Antonio, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Texas.  SDS of San Antonio's principal place of business is located at 403 Ramsey Road, Suite 101, San Antonio, TX 78216.

13. Plaintiff, SDS of Jackson, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Mississippi.  SDS of Jackson's principal place of business is located at 505 Julienne Street, Jackson, MS 39201.

14. Plaintiff, SDS of Mobile, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Alabama.  SDS of Mobile's principal place of business is located at 3350 Halls Mill Road, Suite #D, Mobile, AL 36606.

15. Plaintiff, SDS of Central Texas, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Texas.  SDS of Central Texas' principal place of business is located at 403 E. Ramsey Road, Suite 101, San Antonio, TX 78216.

**Nortek Security and Control – The Predatory Manufacturer**

16. Defendant, Nortek Security and Control, LLC ("NSC") is a Limited Liability Company organized under the laws of the State of California. Defendant NSC's principal place of business is located at 1950 Camino Vida Roble, Suite 150, Carlsbad, CA 92008.

17. NSC is a manufacturer of security, home automation and personal security systems, including, but not limited to, 2GIG security products, and is the alleged leader in wireless security, home automation and personal safety systems and devices having deployed more than 4 million commercial, residential and personal security systems.

18. NSC sells its products through a distribution chain where it sells its products to wholesale distributors such as SDS and Wave Electronics, Inc.  These wholesale distributors then sell the product to retailers and installers who provide the equipment to end users.

19. NSC maintains a 10% market share of the $2.95 billion intrusion alarm security market, and is third to only to Honeywell International and Tyco.

20. NSC is the manufacturer of 2GIG – Security and Control systems, an intelligent connected system for residential intrusion detection ("Nortek Products").

**Wave Electronics, Inc. – The Favored Purchaser and Corporate Briber**

21. Defendant, Wave Electronics, Inc.  ("Wave" and "Favored Purchaser") is a Texas Corporation organized under the laws of the State of Texas. Defendant Wave's principal place of business is located at 8648 Glenmont Drive, Suite 130, Houston, Texas while managing branches located in Texas, Louisiana, Florida, California, Arizona and New York.

22. Wave is a direct competitor of SDS and is also a wholesale distributor of networking, audio, CCTV, intrusion alarm systems, access control, fire alarms and home automation systems

that distributes product to retailers and installers nationally via online sales and eleven branches located in Texas, Louisiana, Florida, California, Arizona and New York, including, but not limited to, the Nortek Products which are subject to this action.

23. Wave, along with SDS, is a distributor of NSC's 2GIG – Security and Control Systems.

24. Accordingly, Wave is a direct competitor of SDS with respect to the marketing and sale of Nortek Products, and remains a direct competitor of SDS in the marketing and sale of security and control systems in general and specifically within the geographic areas where the marketing territories overlap as well as the entire United States for online sales.

25. SDS and Wave compete for business from the same customers in the same distribution chain.

26. SDS has been unable to successfully compete with Wave since October 2015 due to the Defendants' wrongful conduct, as herein below described.

27. Wave regularly provided corporate bribes in the form of cash, American Express cards, and electronics, and/or other goods or services to manufacturers and dealers.

**Earnest Bernard – the Bribee / NSC's Bag Man**

28. Defendant, Earnest Bernard ("Bernard") is a former employee of NSC who is a resident of Houston, Texas who worked in NSC's Texas based office.  He is currently employed by Qolsys and lives at 6508 Parkway Avenue, North Richland Hills, TX 76182.

29. Bernard worked as NSC's sales representative selling 2GIG products to both SDS and Wave.

30. While employed by, and on behalf of, NSC, Bernard provided Wave with preferential pricing via a significant unpublished rebate allowing Wave to price its 2GIG products for sale to retail customers at a price that was less than SDS' wholesale price.  Wave refered to this anti-competitive program as the "Four Star Program."

31. NSC's corporate management was aware that Bernard was providing this preferential pricing to Wave to the detriment of NSC's other wholesale distributors.

32. In return for NSC allowing Wave's anti-competitive pricing, Bernard accepted corporate bribes from Wave consisting of payments from Wave, MSTR Brands (a Wave subsidiary) as well as funds laundered through American Express gift cards in lieu of cash payments. *See Exhibit C*, transcript of telephone conversation with Mike Rempe.

33. NSC, Wave and Bernard have all conspired with each other to commit intentional or willful acts destroying the competitive market for Nortek Products against SDS and are answerable, in solido, for the damage caused by such acts.

## **JURISDICTION AND VENUE**

34. This Court possesses subject matter jurisdiction over SDS' claims asserted under the Robinson-Patman and Clayton Acts, as hereinafter set forth, pursuant to 15 U.S.C. §13, et. seq., and 15 U.S.C. §15, based on federal question jurisdiction.

35. This Court possesses subject matter jurisdiction over SDS' claims asserted, as hereinafter set forth, pursuant to 28 U.S.C. §1337, as this action arises under an Act of Congress regulating commerce or protecting trade and commerce against restraints.

36. This Court possesses subject matter jurisdiction over SDS' state law claims asserted against defendants, as hereinafter set forth, pursuant to 28 U.S.C. § 1367, based on the principles of supplemental jurisdiction.

37. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) and (3), and 28 U.S.C. §1391(c) and (d), in that the defendants are subject to personal jurisdiction in this District,

and a substantial part of the events and omissions giving rise to SDS' claims occurred in this District.

## FACTS

**SDS and Wave are Direct Competitors and Distributors of NSC Products**

38. Both SDS and Wave are authorized manufacturer distributors of the 2GIG security equipment manufactured by NSC.

39. NSC distributes its 2GIG line of products from facilities and offices located in California and Colorado.

40. SDS has been in the business of distributing NSC, and their predecessors' products, since 2004.

41. Wave is an entity that is new to the business of distributing Nortek Products as it formerly served solely as a distributor of consumer audio and video products.

42. Wave first became involved as a distributor of NSC's 2GIG products in 2015 when it made the decision to sell the 2GIG line of products.

43. In less than two years, Wave became the largest purchaser of 2GIG products from Nortek, particularly through its participation in the "Four Star Program".

44. SDS and Wave target the identical market of product installers and retailers in geographic regions that overlap.

45. Due to internet sales, both SDS and Wave compete in all fifty states distributing security panels to an infinite number of retail dealers and installers.

46. Furthermore, the brick and mortar retail outlets for both SDS and Wave cover similar territories that overlap each other, predominately in the states of Louisiana and Texas.

47. As the manufacturing and distribution of the 2GIG products from NSC originate in California and Colorado, and SDS and Wave maintain outlets in both Texas and Louisiana, the sale and distribution of NSC electronics to both SDS and Wave cross state lines and fall within the category of interstate commerce.

48. The relevant sales/ transactions referenced herein were all made across state lines.

**Wave and NSC Conspired to Provide Preferential Pricing to Wave**

49. The 2GIG products referenced in this Complaint are identical products that are of like grade and quality.

50. Nortek intentionally discriminated in price between SDS and Wave with respect to the pricing of 2GIG products.

51. For years, SDS purchased equipment from NSC pursuant to terms similar to those provided to SDS' competitors that also sold similar Nortek Products.

52. Pursuant to those terms, each supplier competed with the others based upon price, delivery, credit terms, location and customer service.

53. NSC's terms were consistent and only varied in limited circumstances when the Nortek Products being sold to special dealers that purchased an extraordinary volume of NSC equipment.

54. The special pricing for these extraordinary retailers was negotiated through wholesalers such as SDS or Wave.

55. After Wave entered this market, they created a program that they named the "Four Star Program" where they would work with NSC to provide special pricing to extraordinary equipment purchasers.

56. This special Four Star Program pricing provided for a standard sales price but provided a significant rebate that was kicked back to the Preferred Purchaser after the sale was complete.

57. This significant rebate reduced the wholesale cost of the product and allowed the Preferential Purchaser to sell its products at a price lower than the standard wholesale price for the product while still earning a significant profit.

58. As a result of the rebate scheme, the pricing that NSC provided to Wave for these Four Star retailers was significantly lower than the prices offered to SDS, and Wave's other competitors.

59. In fact, Wave's published retail sales price for similar products was significantly less than the wholesale price that NSC sold similar equipment to SDS. *See Exhibit A in globo*, which shows the Wave's retail price of 2GIG products to its customer to be $10.80 cheaper than SDS's cost to purchase the items from NSC. Hence, Wave can sell the product to its customer for less than SDS can purchase from the manufacturer.

60. Wave was able to sell these products to its clients for a price lower than the price charged by NSC to SDS due to the special terms and rebates negotiated between NSC and Wave for the Four Star Program.

61. Wave and NSC conspired to put nearly all of Wave's customers in the Four Star Program, obtaining preferential pricing and rebates by combining many of its customers into a single retail customer that qualified for the Four Star pricing.

62. As such, virtually all of Wave's customers fell within the scope of the program, and Wave was provided preferential pricing and rebates on all of the Nortek Products that it purchased from NSC.

63. NSC was, at all times, aware that Wave was misusing the Four Star Program to secure artificially low pricing and rebates for its customers that did not meet the requirements to obtain special pricing. *See Exhibit B*, transcript of telephone conversation between Bill Donahue, VP of Sales at NSC and Ron Broussard.

64. NSC knew it was giving a distinctive advantage to Wave with the SPR pricing, which began in October 2015, to the detriment of its other distribution partners, and that NSC could get in trouble. *See Exhibit B.*

**Wave Conspired with and Bribed NSC to Obtain Preferential Pricing**

65. NSC, and its employees, were active participants in this scheme in an attempt to push a higher percentage of its product through Wave, its Preferred Distributor, as Wave was providing NSC, through its employees, with corporate bribes and kickbacks to have them overlook the misrepresentations required to make the Four Star Program the standard pricing for Wave's customers.

66. Furthermore, once NSC's senior management became aware of the scheme, they allowed it to continue.

67. MSTR Brand is a sister company of Wave that uses Wave's principal place of business located at 8648 Glenmont Drive, Suite 130, Houston, Texas as its primary business address.

68. MSTR Brand is a distributor of audio and video products owned by Mark and Ainslie Fukuda.

69. Mark Fukuda is also the President and Chief Operating Officer of Wave.

70. Ainslie Fukuda is also the Vice President of Purchasing of Wave.

71. Wave and NSC developed a scheme where Wave provided bribes and corporate kickbacks to NSC by issuing payments from MSTR Brand's accounts directly to Bernard, NSC's employee.

72. MSTR Brand provided Bernard with a 1099 tax form that provided evidence of the payments made to Bernard.

73. As Bernard was an employee of NSC, and not a true MSTR dealer, and the issuance of a 1099 provided evidence of the scheme, Wave discontinued the use of MSTR Payments to bribe Bernard and instead started purchasing American Express Gift cards that it provided to Bernard in lieu of the bribery payments previously issued by MSTR Brands.

74. Wave used these American Express Gift Cards as bribery payments as they provided less of a paper trail evidencing the payments.

75. Bernard used the corporate bribes that he received from MSTR Brand to pay off his home and vehicle.

76. NSC and Bernard, in return for the bribes provided by Wave through its MSTR Brand subsidiary, agreed to allow Wave to perpetuate its scheme of placing virtually all of its smaller dealers into the Four Star Program allowing Wave to receive preferential pricing that was not provided to NSC's other distributors such as SDS.

77. This bribery scheme, and the acceptance of Wave's Four Star Program as a single preferred dealer, was done with the knowledge of Wave and Wave's senior management.

78. This bribery scheme was also done with the knowledge of NSC and its agents. Further, even after knowledge of this scheme was revealed, NSC desired to continue the Four Star Program for several months until the end of 2017.

**Wave Obtained Preferential Pricing from NSC by Aggregating All Small Dealers into a Single Dealer for Rebate Purposes**

79. NSC executives and managers have discussed their knowledge of the Four Star Program scheme with representatives of SDS on several occasions admitting that they had knowledge of the program, that the program provided for unfair competition, was illegal and needs to be stopped. *See Exhibit B.*

80. NSC consulted with outside counsel who informed them that the acceptance of the Four Star Program, and its preferential pricing scheme, was a violation of United States Antitrust law and needed to be stopped right away.

81. In April of 2017, NSC's Chief Operating, Officer Michael O'Neal, met with SDS' President, Ron Broussard, in Las Vegas, Nevada and discussed the anti-competitive nature of the Four Star Program.

82. NSC's CEO admitted that the Four Star Program was being abused by Wave and promised that NSC would halt the program, and its anti-competitive rebate scheme, right away.

83. Despite NSC's April 2017 assertion that the program would stop immediately, the program continues and SDS remains unable to compete with Wave selling Nortek Products.

84. Mr. Broussard also discussed Wave's preferential pricing scheme with Rick Campbell, NSC's product representative for both Wave and SDS.

85. On August 1, 2017, NSC's National Sales Manager, Bill Donahue, notified Wave that the Four Star Program would be disbanded within 30 days. *See Exhibit B.*

86. Bill Donahue informed Mr. Broussard that NSC's outside counsel had instructed NSC's management that the program must be shut down immediately. *See Exhibit B.*

87. Mr. Donahue informed Mr. Broussard that NSC's senior managers were not interested in shutting the program down immediately and instead wanted to run the scheme through the end of 2017. *See Exhibit B.*

88. Wave objected to the discontinuation of the program and contacted Dan Geiger, Senior Vice President of Sales, and Mike O'Neal, NSC's Chief Operating Officer, to request the continuation of the program.

89. Mr. Geiger provided Wave with a continuation of their anti-competitive scheme for all dealers for another sixty days and grandfathered in Wave's top thirty dealers allowing them to continue to utilize preferential pricing for a majority of its business.

90. NSC's National Sales Manager, Bill Donahue, spoke to Mr. Broussard on August 25, 2017.

91. Mr. Donahue admitted that Wave was running hundreds of dealers through the Four Star Program and that SDS should be scratching its head trying to figure out how these small dealers received pricing so low. *See Exhibit B.*

92. Mr. Donahue admitted that NSC was aware that Wave uses the Four Star Program pricing as "their day to day sale price." *See Exhibit B.*

93. Mr. Donahue admitted that Wave has enjoyed this special pricing scheme since October of 2015. *See Exhibit B.*

94. Mr. Donahue told Mr. Broussard that Wave "had a distinct advantage in the marketplace" and that Wave built their business "at the detriment of some our other distribution partners." *See Exhibit B.*

95. Mr. Donahue told Wave that what they were doing borders on being illegal, can get Nortek in trouble and must immediately stop. *See Exhibit B.*

96. Mr. Donahue also admitted that Wave had a distinct pricing advantage against all other 2GIG distributors in the day to day business of selling 2GIG products. *See Exhibit B.*

97. Mr. Donahue admitted to Mr. Broussard that NSC and Wave's pricing structure was wrong, hurting NSC's reputation in the market, damaging the pricing integrity of the market, and damaging all of NSC's distributor relationships. *See Exhibit B.*

98. Mr. Donahue brought his concerns to the General Counsel of NSC, Dan Schatz, who admitted that the scheme was illegal and told Mr. Donahue that the scheme had to stop right away. *See Exhibit B.*

99. Despite Mr. Donahue pleading with NSC to end the pricing program immediately, Chris Miller, Vice President of Strategy and Development, opposed ending the program, even after being admonished by outside counsel that the program is illegal.

100.    NSC continued with this scheme, long after outside counsel notified them that the program was illegal, in an effort to drive SDS from the market allowing Wave to retain the market share that it had developed by the use of the Four Star Program.

101.    Mr. Donahue also admitted that allowing Wave to grandfather in 30 of its best dealers into the ongoing Four Star Program is unfair and would have a detrimental impact upon the relevant market.

102.     NSC never offered a similar Four Star Program to SDS.

**As a Result of Defendants' Predatory Pricing Scheme, competition has been injured and SDS has Sustained Significant Financial Losses and Loss of Market Share**

103.     As a result of Defendants' predatory pricing scheme to allow Wave an advantage in pricing, competition has been injured. Injury to competition naturally occurs when a favored purchaser's retail price is lower than the wholesale purchase cost of its competitors.

104.     For example, as a result of the price discrimination and NSC'S unfair pricing scheme with Wave, SDS has lost a significant number of customers to Wave, has been unable to compete with Wave for new potential customers and has suffered significant financial losses including the loss of sales, profits and market share.

105.     SDS has lost approximately 59 clients to Wave due to SDS inability to match the prices offered by Wave.

106.     The loss of business to Wave continues to grow and this list will grow as long as the prohibited price description continues.

107.     SDS estimates its annual losses for each of the 59 clients as follows:

| SDS Location | Customer | Estimated Annual Volume |
|---|---|---|
| Houston | CSG | $ 300,000.00 |
| Houston | Light Speed Security | $ 240,000.00 |
| Houston | Datasmart | $ 20,000.00 |
| Houston | C.O.C. Surveillance | $ 15,000.00 |
| Houston | W&W Telephone | $ 10,000.00 |
| Houston | AHS Solutions | $ 10,000.00 |
| Houston | Halo Professionals | $ 40,000.00 |
| Houston | RAB | $ 240,000.00 |
| Houston | Juggernaut Systems | $ 180,000.00 |
| Houston | Safeguard Burglar | $ 240,000.00 |
| Houston | Golden Gates Security | $ 100,000.00 |
| Dallas | Select Security Group | $ 180,000.00 |
| Dallas | DFW Security | $ 1,200,000.00 |
| Dallas | Vault Security | $ 600,000.00 |

| | | | |
|---|---|---|---:|
| Dallas | Forward Home Security | $ | 1,080,000.00 |
| Dallas | The Chron Organization | $ | 240,000.00 |
| Shreveport | United Automation | $ | 250,000.00 |
| Shreveport | ASG Monroe | $ | 100,000.00 |
| Shreveport | Allied Security Technology | $ | 100,000.00 |
| Shreveport | Alarmco | $ | 50,000.00 |
| Shreveport | Security Pro | $ | 80,000.00 |
| Shreveport | Modern Security | $ | 35,000.00 |
| Shreveport | Cam-Tech | $ | 35,000.00 |
| Shreveport | Smart Security | $ | 35,000.00 |
| Baton Rouge | Elite Solutions | $ | 100,000.00 |
| Baton Rouge | A-1 Security | $ | 30,000.00 |
| Baton Rouge | Heavenly Homes | $ | 30,000.00 |
| Baton Rouge | DMI | $ | 30,000.00 |
| Baton Rouge | Smart Homes of La | $ | 120,000.00 |
| Baton Rouge | Louisiana Custom Media | $ | 120,000.00 |
| Baton Rouge | Custom Security | $ | 400,000.00 |
| Mandeville | LA Nationwide | $ | 120,000.00 |
| New Orleans | USA Fire and Burg | $ | 750,000.00 |
| New Orleans | Lynk Security | $ | 100,000.00 |
| New Orleans | Top Notch Security | $ | 75,000.00 |
| New Orleans | Safe and Secure | $ | 75,000.00 |
| New Orleans | State of the Art | $ | 50,000.00 |
| New Orleans | Alpha Security | $ | 100,000.00 |
| New Orleans | ABC Security | $ | 175,000.00 |
| New Orleans | Crescent City Electonics | $ | 50,000.00 |
| New Orleans | Sound Creation | $ | 100,000.00 |
| New Orleans | Tassin Security | $ | 100,000.00 |
| New Orleans | Hallock Security | $ | 50,000.00 |
| New Orleans | Eagle Security | $ | 50,000.00 |
| New Orleans | Home Protection | $ | 50,000.00 |
| New Orleans | Major Security | $ | 75,000.00 |
| New Orleans | Savoie Security | $ | 100,000.00 |
| New Orleans | Pro A/V | $ | 50,000.00 |
| New Orleans | BP Security | $ | 50,000.00 |
| New Orleans | Texas Fire | $ | 125,000.00 |
| New Orleans | Digitech Security | $ | 50,000.00 |
| New Orleans | Hi Tech Smart Homes | $ | 50,000.00 |
| Mobile | IET | $ | 60,000.00 |
| Mobile | ASAP | $ | 150,000.00 |
| Mobile | Tapper | $ | 200,000.00 |
| Mobile | Watchtower | $ | 60,000.00 |

| | | | |
|---|---|---|---:|
| Mobile | Trio Alarm | $ | 200,000.00 |
| Mobile | Persich | $ | 75,000.00 |
| Mobile | Prostar | $ | 75,000.00 |
| Mobile | Securimax | $ | 200,000.00 |
| | **TOTAL** | **$** | **9,575,000.00** |

108.     These losses are annual losses that are easily accounted for.  In addition to these losses, SDS has lost other business that they have not yet been able to quantify as of the filing of this Complaint.

109.     In addition to the loss of these 59 clients, SDS has recently opened an outlet in San Antonio, Texas.

110.     Although the San Antonio store is a distributor of Nortek products, SDS has not been able to sell a single piece of Nortek Products in this market because Wave is offering the Nortek Products for sale at prices 40% below the wholesale price that NSC sells the equipment to SDS.

111.     SDS has discovered that the substantial decreases which it experienced in the sale of Nortek Products was and remains the proximate result of defendants' predatory price discrimination and other unlawful conduct.

112.     SDS' drop in Nortek Product sales was instigated and promoted by defendants actions including unfair pricing and corporate bribery.

113.     Due to Nortek's preferred pricing program that favors Wave over all other distributors, there remains only one significant distributor of Nortek Products therein, Nortek's favored purchaser, Wave.

**COUNT I –**

**VIOLATIONS OF 15 U.S.C. §13(a) (Robinson-Patman Act)**

114.     SDS realleges and incorporates by reference all the prior allegations contained in this Complaint.

115.     At all relevant times hereto, NSC, Wave and Bernard were, and continue to be, persons engaged in interstate commerce, as defined by 15 U.S.C. §13 of the Robinson-Patman Act.

116.     During the relevant time periods herein and continuing through the present time, NSC has manufactured and sold, and continues to manufacture and to sell the Nortek Products through SDS and Wave.

117.     At all relevant times hereto, NSC, through SDS and Wave and other manufacturer representatives, in the course of commerce has manufactured and sold the Nortek Products to numerous distributors and customers located throughout the United States, many of whom being in direct competition with SDS, including, but not limited to Wave, the Favored Purchaser.

118.     At all relevant times hereto and continuing through the present time, SDS has purchased large quantities of the Nortek Products from NSC for resale to SDS' customers.

119.     At all relevant times hereto and as more particularly described herein, NSC, in the course of commerce has sold, and are continuing to sell, Nortek Products to the Favored Purchaser - commodities of like grade and quality to those sold by NSC to SDS at discriminatory prices which prices were, and remain, substantially less than NSC charged, and presently is charging, to SDS for the identical Nortek Products.

120.     These commodities of like grade and quality include the 2GIG products. *See Exhibit A in globo*, pricing lists for Wave products and SDS products.

121.     Upon information and belief, as more particularly described herein above, and in the course of commerce, NSC has sold Nortek Products, and/or commodities of like grade and quality, to Wave, the Favored Purchaser, granting to them rebates, discounts and other allowances, and/or "special" financing terms, which were not disclosed to, offered to, or given to SDS.

122.     Upon information and belief, Wave's preferred pricing through rebates, discounts, other allowances, and/or "special" financing terms began in October 2015 and occurred with Wave's multiple transactions with NSC, including during the time SDS purchased commodities of like grade and quality from NSC.

123.     Upon information and belief, this predatory pricing scheme resulted in a difference in price.

124.     The retail price to Wave's customers was $10.80 less than SDS's wholesale purchase price of the same exact items from NSC. In essence, Wave was able to sell the 2GIG items for less than SDS could purchase them.

125.     Upon information and belief, NSC's predatory pricing and related illegal discriminatory practices were not, and are not, justified based upon any differences in the cost of manufacture, sale or delivery resulting from any differing methods or quantities in which the subject commodities were, or are, sold or delivered to SDS, as compared to the Favored Purchasers of Nortek Products, or products of like grade and quality.

126.     Upon information and belief, NSC's predatory pricing and related illegal discriminatory practices as aforesaid with respect to its sales of Nortek Products, or as to its sales of commodities of like grade and quality, were not, and are not, justified based upon changing conditions affecting the market for, or the marketability of, the goods concerned.

127.     SDS, and its competitors, including the Favored Purchaser, market and sell both the Nortek Products and other electronics to the same customers, and did so contemporaneously during the relevant time periods herein.

128.     As a result of NSC's predatory pricing and related illegal discriminatory practices with respect to their sales of Nortek Products, SDS effectively has been precluded from selling Nortek Products and other electronics to certain of its customers, and/or SDS has suffered a substantial decrease in sales and profits to many of its customers.

129.     As a direct and proximate result of the discriminatory pricing and related illegal practices being engaged in by NSC, with respect to the Favored Purchaser, SDS' ability to compete with the Favored Purchaser (and perhaps other favored distributors) for sales of the Nortek Products to SDS' customers has been substantially diminished, and, SDS' ability to compete with the Favored Purchaser has been totally eliminated.

130.     The effect of NSC's predatory actions and unfair business conduct has been substantially to lessen competition in the affected line of commerce, and particularly in the areas where SDS and Wave's market's overlap.

131.     NSC's predatory actions and unfair business conduct have injured, destroyed and/or prevented fair competition in the marketplace.

132.     NSC's predatory actions and unfair business conduct have injured, destroyed and/or prevented fair competition, including but not limited to competition, among SDS and its competitors, and particularly in the areas where SDS and Wave's market's overlap.

133.     NSC's predatory actions and unfair business have injured, destroyed and/or prevented fair competition between SDS, and other distributers, and the Favored Purchaser competitor, who have received the benefit of NSC's price discrimination and related improper sales practices.

134.     NSC's predatory actions and unfair business conduct have injured, destroyed and/or prevented fair competition, including but not limited to competition among SDS' and its competitors' customers.

135.     NSC's predatory actions, price discrimination and unfair business conduct as referenced herein constitute multiple violations of the Robinson-Patman Act, including, but not limited to, 15 U.S.C. §13(a).

136.     As a proximate result of NSC's predatory actions, price discrimination and unfair business conduct as referenced herein, SDS has suffered substantial economic losses and other damage to its business, reputation and customer goodwill, including, but not limited to, lost sales and profits.


**COUNT II**

**VIOLATIONS OF 15 U.S.C. §13(a) and §13(f) (Robinson-Patman Act)**

137.     SDS realleges and incorporates by reference all the prior allegations contained in this Complaint.

138.      Wave and Bernard, being persons engaged in commerce, in the course of such
commerce as described above, knowingly have induced (and are continuing to induce),
and/or knowingly have received (and are continuing to receive), discriminations in the prices
of Nortek Products by and/or from NSC.

139.      Wave and Bernard knowingly have induced (and are continuing to induce), and/or
knowingly have received (and are continuing to receive) the prohibited discrimination in
price, in part or in whole, in exchange for: (i) NSC's agreement to provide Wave with Nortek
products below its competitors' costs; (ii) Wave providing NSC representatives, including
but not limited to, Bernard complimentary gifts, services, meals, etc; and (iii) Wave
providing bribes to NSC representatives, including but not limited to, Bernard, cash
payments via the delivery of checks, cash and American Express gift cards.

140.      The effect of Wave and Bernard 's predatory actions and unfair business conduct as
referenced herein has been substantially to lessen competition in the affected line of
commerce.

141.      Wave and Bernard 's predatory actions and unfair business conduct as aforesaid have
injured, destroyed and/or prevented fair competition, including but not limited to competition
among SDS, the Favored Purchaser and perhaps other favored distributors, who have
received the benefit of NSC's price discrimination.

142.      Upon information and belief, Wave and Bernard 's predatory actions and unfair
business conduct have injured, destroyed and/or prevented fair competition, including but not
limited to competition among SDS' and its competitors' customers.

143.    Wave and Bernard's predatory actions, knowing inducement and/or receipt of discriminatory pricing and unfair business conduct as aforesaid constitute multiple violations of the antitrust laws of the United States including, but not limited to, of the Robinson Patman Act, 15 U.S.C. §13(a) and 15 U.S.C. §13(f).

144.    As a direct and proximate result of Wave and Bernard 's predatory actions, knowing inducement and/or receipt of discriminatory pricing and unfair business conduct as aforesaid, SDS has suffered substantial economic losses and other damage to its business, reputation and customer goodwill, including, but not limited to, lost sales and profits.

## COUNT-III

### VIOLATIONS OF 15 U.S.C. §13(d) (Robinson-Patman Act)

145.    SDS realleges and incorporates by reference all the prior allegations contained in this Complaint.

146.    NSC, Wave and Bernard, being persons engaged in commerce, in the course of such commerce as described herein above, have offered, granted, or paid rebates and/or promotional allowances, services, or other items of value, to or for the benefit of the Favored Purchaser as compensation or in consideration for services and/or facilities furnished by or through the Favored Purchaser in connection with the processing, handling, sale, or offering for sale of the Nortek Products by NSC.

147.    The rebates and/or promotional allowances or services, or other items of value offered, granted and paid by NSC, Wave and Bernard, to or for the benefit of the Favored Purchaser as above set forth, were not made available on proportionally equal terms to all

other customers (including, but not limited to, SDS) competing in the distribution of Nortek Products.

148.     Even after discovery of the Four Star Program by SDS, NCS still did not offer a similar promotional allowance or service to SDS.

149.     The effect of NSC, Wave and Bernard's predatory actions and unfair business conduct as aforesaid has been substantially to injure and lessen competition in the affected line of commerce.

150.     NSC, Wave and Bernard 's predatory actions and unfair business conduct have injured, destroyed and/or prevented fair competition, including but not limited to competition among SDS and its competitors, who have received the benefit of NSC's rebates and/or allowances, or other items of value.

151.     NSC, Wave and Bernard 's predatory actions and unfair business conduct as aforesaid have injured, destroyed and/or prevented fair competition, including but not limited to competition among SDS's and its competitors' customers.

152.     NSC, Wave and Bernard 's rebates and/or promotional allowances or services, or other items of value offered, granted and paid by NSC, Wave and Bernard, to or for the benefit of the Favored Purchaser as above set forth, constitute multiple violations of the antitrust laws of the United States including, but not limited to, of the Robinson-Patman Act, 15 U.S.C. § 13(d).

153.     As a direct and proximate result of NSC, Wave and Bernard 's rebates and/or promotional allowances or services, or other items of value offered, granted and paid by NSC, Wave and Bernard, to or for the benefit of the Favored Purchaser as aforesaid, SDS has

suffered substantial economic losses and other damage to its business, reputation and customer goodwill, including, but not limited to, lost sales and profits.

## COUNT - IV

## CORPORATE BRIBERY AND

## VIOLATIONS OF 15 U.S.C. §13(c) (Robinson-Patman Act)

154.     SDS realleges and incorporates by reference all the prior allegations contained in this Complaint.

155.     An employee commits the offense of commercial bribery if, without the consent of his employer, he intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person on agreement or understanding that the benefit will influence his conduct in relation to the affairs of his employer.

156.     The offense of commercial bribery is complete once the employee accepts the benefit or agrees to have his conduct influenced by a benefit, whether or not the employee subsequently acts in furtherance of the agreement.

157.     Bernard, while he was an employee and agent performing the work of his employer, NSC, accepted cash, checks, American Express gift cards and other items of value from Wave.

158.     Wave knowingly provided these items of value to Bernard to influence his conduct in relation to Wave's to implementation of  its Four Star Program allowing Wave to include all of its small dealers into a single dealer that qualified for NSC's special pricing and rebates.

159.     Bernard negotiated the special terms between Wave and NSC as a result of Wave making the corporate bribes that were accepted by Bernard, and possibly other NSC employees.

160.     With its bribery scheme, Wave knowingly induced and received a prohibited discrimination in price to the detriment of competition in the market.

161.     Once NSC became aware that Bernard was accepting corporate bribes, Bernard resigned from NSC's employment.

162.     After Bernard resigned due to the bribery scandal, NSC terminated Bernard's direct supervisor, Adam Kruger.

163.     Despite terminating Bernard for accepting these bribes, NSC managers have allowed the special pricing and rebates provided to Wave to continue.  As such, NCS is complicit in the act of bribery as it continues to accept Wave as a Favored Purchaser under terms that its counsel stated should be discontinued.

164.     As a result of the bribes paid by Wave to Bernard, Wave received special pricing, which resulted in SDS paying a higher price for its goods.

165.     As a direct and proximate result of the Defendants' corporate bribery scheme, SDS has suffered damages, and will continue to suffer damages. SDS is therefore entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorney fees.


## COUNT - V

## STATE LAW CLAIMS FOR CORPORATE BRIBERY

166.     SDS realleges and incorporates by reference all the prior allegations contained in this Complaint.

167.     While corporate bribery may be a crime, persons are still able to obtain civil remedies for damages as a result of criminal behavior (i.e. – victims of murder, assault, battery, et cetera, or their family members, may proceed against the person committing the harmful acts for civil damages.)

168.     Particularly in Louisiana, La. Civ. Code art. 2315 allows that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.

169.     As a direct and proximate result of the Defendants' corporate bribery scheme, SDS has suffered damages, and will continue to suffer damages. SDS is therefore entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorney fees.

## COUNT - VI

## VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES ACT

170.     SDS realleges and incorporates by reference all the prior allegations contained in this Complaint.

171.     This claim under the Louisiana Unfair Trade Practices Act ("LUTPA"), La. Rev. Stat. § 51: 1401, et seq., is brought to secure redress for the unlawful, deceptive and unfair trade practices perpetrated by the Defendants unfairly discriminating against SDS in the market for Nortek Products.

172.     SDS is a "person" and "consumer" under LUTPA, and the transactions at issue in this

suit are "trade or commerce" as defined by LUTPA and the Louisiana case law interpreting

and applying LUTPA.

173.     A private right of action under LUTPA extends to business competitors, consumers,

and any other persons who assert a loss of money or property as a result of the use or

employment by another person of an unfair or deceptive method, act, or practice.

174.     Wave and Bernard's actions as described herein violate LUTPA, which was enacted

to protect the consuming public, including SDS, from those who engage in unconscionable,

deceptive, or unfair acts or practices in the conduct of any trade or commerce.

175.     In particular, Wave's exchange of money and other items of value with Bernard in

exchange for the creation and/or application of the Four Star Program pricing scheme, which

was not offered to other competitors, constituted a deceptive and unfair trade practice,

method, or act under LUTPA.

176.     Nortek's continued allowance of cumulating multiple customers under one pricing

structure in order for Wave to secure an unfair pricing rebate was deceptive, unfair, and

unlawful.

177.     Nortek's refusal to provide the same promotional allowance or service, or rebate

scheme that it was providing to Wave to its other distributors on a proportionally equal basis

was unlawful.

178.     This unfair and deceptive trade practice, method, or act injured competition.

179.     When engaging and competing with SDS for the sale and distribution of Nortek

Products, Wave and Bernard engaged in anti-competitive pricing and knowing and fraudulent

concealment, suppression, or omission of materials facts with the intent to hide their acts and practices.

180.    The Defendants' anti-competitive pricing, misrepresentations and concealment of material facts constitute unconscionable commercial practices, unfair methods of competition and unfair or deceptive act or practice in the conduct of trade or commerce under § 51: 1401, et seq.

181.    Upon information and belief, Wave and Bernard participated in fraudulent conduct when Wave exchanged money and/or other items of value with Bernard in exchange for the Four Star Program, which allowed Wave to cumulate many small customers under one customer name to receive a rebate. This process was not offered to SDS or other distributors.

182.    Upon information and belief, Wave and Bernard's fraudulent conduct continued when it hid the pricing scheme from other competitors.

183.    Upon information and belief, this fraudulent conduct began when Wave, an audio/visual company moved into the security business and started buying products from Nortek in October 2015.

184.    Upon information and belief, Nortek continued this fraudulent conduct when it refused to admit to SDS that the Four Star pricing scheme existed and failed to offer a similar scheme to SDS and other competitors.

185.    Said acts and practices on the part of the Defendants were and are illegal and unlawful pursuant to LUTPA.

186.     The acts and practices in violation of LUTPA by Wave, Nortek, and Bernard began in 2015 and continue to run anew each day that Defendants engage in these anti-competitive practices, a continuing tort.

187.     Upon information and belief, the Defendants have intentionally and knowingly employed these same unconscionable, deceptive, or unfair acts or practices on other persons and consumers in Louisiana as well as in numerous other states in which the Defendants operate.

188.     The above-described actions by Defendants constitute violations of LUTPA.

189.     LUTPA establishes a private right of action to enforce such violations as outlined above and allows for the recovery of treble damages as well as attorney fees and costs

190.     As a direct and proximate result of the Defendants' violations of Louisiana Law, SDS has suffered damages, and will continue to suffer damages. SDS is therefore entitled to compensatory damages, treble damages, equitable and declaratory relief, punitive damages, costs and reasonable attorney fees.

## COUNT - VII

### VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT

191.     SDS realleges and incorporates by reference all the prior allegations contained in this Complaint.

192.     SDS particularly realleges and incorporates by reference the particular allegations regarding fraud in Section VI.

193.     This claim under the Texas Deceptive Trade Practices Act ("DTPA"), Texas Business & Commerce Code § 17:41, et seq., is brought to secure redress for the false, misleading, and

deceptive acts perpetrated by the Defendants unfairly discriminating against SDS in the market for Nortek Products.

194.     SDS is a "consumer" under DTPA, and the transactions at issue in this suit are "in the conduct of any trade or commerce" as defined by DTPA and the Texas case law interpreting and applying DTPA.

195.     Wave's actions or omissions as described herein, including but not limiting the giving of money and/or other items of monetary value of Nortek's employee and agent, Earnest Bernard to induce a price reduction, violate DTPA, which was enacted to protect the consuming public, including SDS, from those who engage in unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

196.     Bernard's acceptance of money and/or items of monetary value in exchange for a discriminatory price reduction violate DTPA, which was enacted to protect the consuming public, including SDS, from those who engage in unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

197.     Nortek's actions or omissions as described herein, including but not limited to failure to provide the Four Star Program on a proportionally equal level to all distributors, misrepresenting the existence of the program to SDS, and allowing the price discrimination structure to remain in place after notification of its illegality, violate DTPA, which was enacted to protect the consuming public, including SDS, from those who engage in unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

198.     When engaging and competing with SDS for the sale and distribution of Nortek

Products, Defendants engaged in a knowing and fraudulent concealment, suppression, or

omission of materials facts with the intent to hide their acts and practices.

199.     The Defendants' misrepresentations and concealment of material facts constitute

unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation, or

the knowing concealment, suppression, or omission of materials facts with the intent that

others rely on such in connection with the sale and distribution of Nortek Products.

200.     The Defendants' actions or omissions as described herein were intentional acts

perpetuated by Defendants.

201.     As the Defendants acts were intentional, SDS is entitled to an award of "additional

damages" in an amount not exceeding three times the actual damages.

202.     Said acts and practices on the part of the Defendants were and are illegal and

unlawful pursuant to DTPA.

203.     Defendants' acts and practices in violation of DTPA began in 2015 and continue to

run anew each day that Defendants engage in these anti-competitive practices, a continuing

tort.

204.     Upon information and belief, the Defendants have intentionally and knowingly

employed these same unconscionable, deceptive, or unfair acts or practices on other persons

and consumers in Texas as well as in numerous other states in which the Defendants operate.

205.     The above-described actions by Defendants constitute violations of DTPA.

206.     DTPA establishes a private right of action to enforce such violations as outlined

above and allows for the recovery of treble damages as well as attorney fees and costs

207.     As a direct and proximate result of the Defendants' violations of Texas Law, SDS has suffered damages, and will continue to suffer damages. SDS is therefore entitled to compensatory damages, treble damages, equitable and declaratory relief, punitive damages, costs and reasonable attorney fees.

## COUNT - VIII

## VIOLATION OF THE CALIFORNIA UNFAIR PRACTICES ACT AND THE

## CALIFORNIA UNFAIR COMPETITION LAW

208.     SDS realleges and incorporates by reference all the prior allegations contained in this Complaint.

209.     SDS particularly realleges and incorporates by reference the particular allegations regarding fraud in Section VI.

210.     This claim under the California Unfair Practices Act ("UPA") Cal. Bus. & Prof. Code § 16700, et seq. and California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., is brought to secure redress for the unfair pricing, false, misleading, and deceptive acts perpetrated by the Wave, Bernard, and Nortek's unfairly discriminating against SDS in the market for Nortek Products.

211.     SDS meets the definition of "person" under the UCL, which is defined as natural persons, corporations, firms, partnerships, joint stock companies, associations, and other organizations of persons.

212.     The purpose of the UPA and UCL is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.

213.     The UPA and UCL define unfair competition to include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by the false advertising law.

214.     The UPA prohibits price discrimination where the intent of the practice is to lessen competition.

215.     The UPA prohibits the payments of commissions or rebates to selected distributors.

216.     A business act or practice need only meet one of the three criteria—unlawful, unfair, or fraudulent—to be considered unfair competition under the UCL.

217.     SDS is a "competitor" under the UPA and UCL, and the transactions at issue in this suit are "unfair" business practices as defined by the UPA and UCL and the California case law interpreting and applying the UPA and UCL.

218.     Bernard was the agent of Nortek, a California company, and sold the company's goods to distributors.

219.     The Defendants' actions or omissions as described herein violate the UPA and UCL, which were enacted to protect marketplace competitors, including SDS, from those who engage in unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

220.     When engaging and competing with SDS for the sale and distribution of Nortek Products, Defendants engaged in unfair business practices including providing Wave with preferential pricing and rebates that were not made available to SDS, or any other companies competing with Wave.

221.     The Defendants' price discrimination, misrepresentations and concealment of material facts constitute unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation, or the knowing concealment, suppression, or omission of materials facts with the intent that others rely on such in connection with the sale and distribution of Nortek Products.

222.     Said acts and practices on the part of the Defendants were and are illegal and unlawful pursuant to the UPA and UCL.

223.     Defendants' acts and practices in violation of the UPA and UCL began in 2015 and continue to run anew each day that Defendants engage in these anti-competitive practices, a continuing tort.

224.     Upon information and belief, the Defendants have intentionally and knowingly employed these same unconscionable, deceptive, or unfair acts or practices on other persons and consumers in California as well as in numerous other states in which the Defendants operate.

225.     The above-described actions by Defendants constitute violations of the UPA and UCL.

226.     The UPA and UCL establish  private rights of action to enforce such violations as outlined above and allows for the recovery of per violation fines, damages as well as attorney fees and costs.

227.     As a direct and proximate result of the Defendants' violations of California Law, SDS has suffered damages, and will continue to suffer damages. SDS is therefore entitled to

compensatory damages, treble damages, equitable and declaratory relief, punitive damages, costs and reasonable attorney fees.

## COUNT - IX

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

228.     SDS realleges and incorporates by reference all the prior allegations contained in this Complaint.

229.     The common law and Section 1-304 of the Uniform Commercial Code implies into every contract a covenant of good faith and fair dealing. That covenant imposes upon each party to the contract a duty at all times to act in good faith and to deal fairly with the other party, including with respect to the performance and termination of said contract.

230.     To act in good faith and to deal fairly, the parties at all times must act honestly toward each other when performing their contract. When one party engages in an action that has the effect of destroying or injuring the rights of the other party to receive the fruits of its contract, that party has breached its duty.

231.     The duties of good faith and to deal fairly are implied into every contract by law, including distribution agreements between manufacturers and their distributors.

232.     NSC, Wave and Bernard 's  actions and conduct as aforesaid, and in particular its preferential pricing scheme, was demonstrably unreasonable, was undertaken in abject bad faith (as herein above demonstrated), and constitutes an elementary and fundamental breach of the covenant of good faith and fair dealing implied by law.

233.     As a direct and proximate result of NSC, Wave and Bernard 's breach of the implied covenant of good faith and fair dealing as aforesaid, SDS has suffered substantial economic

losses and other damage to its business, reputation and customer goodwill, including, but not limited to, lost sales and profits.

**WHEREFORE**, SDS respectfully requests Final Judgment against the Defendants for the following relief:

On its Causes of Action against NSC, Wave and Bernard, pursuant to 15 U.S.C. § 15, and based upon said defendants' applicable violations of the Robinson-Patman Act,15 U.S.C. §§13(a), 13(c), 13(d) and 13(f), as herein above set forth:

(i) An award of compensatory damages as determined by the Court, to be trebled;

(ii) An award of reasonable attorney's fees and the costs of suit;

(iii) An award of prejudgment interest on the compensatory award of damages;

(iv) Temporary, preliminary and permanent injunctive relief, enjoining and restraining each of said defendants, and each and all of their subsidiaries, affiliates, shareholders, members, directors, managers, officers, employees, agents, representatives and all persons acting in concert with them or on their behalf, from, directly or indirectly, continuing to engage in price discrimination and other predatory conduct prohibited by the Robinson-Patman Act; and

(v) For such other and further relief, whether of a legal or equitable nature, which the Court deems necessary, proper, and/or required based upon the facts and circumstances presented; and

On the remaining Causes of Action against NSC, Wave and Bernard, as herein above set forth:

(i) An award of compensatory damages as determined by the Court, together with interest thereon;

(ii) An award of treble and or punitive damages in an amount sufficient to punish said defendants for their tortious conduct and to deter them from future violations;

(iii) An award of reasonable fines for each violation of the California Unfair Practices Act and California Unfair Competition Law;

(iv) An award of reasonable attorney's fees and the costs and disbursements of this action; and

(v) For such other and further relief, whether of a legal or equitable nature, which the Court deems necessary, proper, and/or required based upon the facts and circumstances presented.

**RESPECTFULLY SUBMITTED:**

**BALDWIN HASPEL BURKE & MAYER, LLC**

*s/ Lawrence R. DeMarcay, III*
**DAVID L. CARRIGEE (#3892)**
**BEVERLY K. BAUDOUIN, (#14423)**
**THOMAS J. CORTAZZO (#18174)**
**LAWRENCE R. DeMARCAY, III (#25379) T.A.**
**LARRY E. MOBLEY (#29990)**
**STEVEN B. "BEAUX" JONES (#33915)**
1100 Poydras Street, Suite 3600
New Orleans, LA  70163
Telephone:  (504) 569-2900
Fax:  (504) 569-2099
dcarrigee@bhbmlaw.com
bbaudouin@bhbmlaw.com
tcortazzo@bhbmlaw.com
ldemarcay@bhbmlaw.com
lmobley@bhbmlaw.com
bjones@bhbmlaw.com

and

*s/ Robert D. Hoffman, Jr.*
**ROBERT D. HOFFMAN, JR. (#06898)**
7039 Highway 190
Covington, LA 70433
(985) 727-3893
Fax (985) 674-9082
Cell (504) 450-1306
robert@hoffmanplc.com
*Attorneys for plaintiffs, SDS*

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2018, I electronically filed the foregoing with the Clerk of Court and all parties by using CM/ECF system, which will send notice of electronic filing to all counsel of record. I further certify that I mailed the foregoing document and notice of electronic filing by first-class mail to the following non-CM/ECF participants: None.

*      /s Lawrence R. DeMarcay, III*
LAWRENCE R. DEMARCAY, III