# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| SECURITY DATA SUPPLY, LLC,<br>SDS OF NEW ORLEANS, LLC, SDS<br>OF BATON ROUGE, LLC, SDS OF<br>MANDEVILLE, LLC, SDS OF<br>MONROE, LLC, SDS OF BOSSIER<br>CITY, LLC, SDS OF DALLAS, LLC,<br>SDS OF HOUSTON, LLC, SDS OF<br>SAN ANTONIO, LLC, SDS OF<br>JACKSON, LLC, SDS OF MOBILE,<br>LLC, AND SDS OF CENTRAL TEXAS,<br>LLC<br><br>VERSUS<br><br>NORTEK SECURITY AND CONTROL,<br>LLC, WAVE ELECTRONICS, INC.<br>AND EARNEST BERNARD | * <br>* <br>* <br>* <br>* <br>* <br>* <br>* <br>* <br>* <br>* <br>* <br>* <br>* <br>* <br>* <br>* <br>* <br>* | CIVIL ACTION NO. 3:18-CV-01399<br><br><br>JUDGE KAREN GREN SCHOLER |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## SECOND AMENDED COMPLAINT

Plaintiffs, Security Data Supply, LLC ("SDS"), and SDS of New Orleans, LLC, SDS of Baton Rouge, LLC, SDS of Mandeville, LLC, SDS of Monroe, LLC, SDS of Bossier City, LLC, SDS of Dallas, LLC, SDS of Houston, LLC, SDS of San Antonio, LLC, SDS of Jackson, LLC, SDS of Mobile, LLC, and SDS of Central Texas, LLC (collectively referred to as "SDS Franchisees"), file this Second Amended Complaint against Nortek Security and Control, LLC ("Nortek"), Wave Electronics, Inc. ("Wave"), and Earnest Bernard ("Bernard").  SDS and the SDS Franchisees shall be collectively referred to as "Plaintiffs."

## SUMMARY OF THE CASE

1.      Plaintiffs bring this action under the antitrust laws of the United States and specifically, pursuant to the provisions of the Robinson-Patman Act, 15 U.S.C. §13, et. seq., and the Clayton Act, 15 U.S.C. §15, seeking treble damages, attorney's fees and other incidental relief based upon the defendants' illegal pricing and price discrimination practices ~i.e., secondary-line price discrimination.  More specifically, Defendants engaged in a bribery and kickback scheme under which Wave induced Nortek and its employees to sell products to Wave at prices far below what Nortek would sell the identical products to SDS or Wave's other competitors.  As a result of Defendants' antitrust violations, competition has been harmed, and Plaintiffs have suffered "antitrust injury" (i.e. direct harm as a result of discriminatory pricing and bribery in violation of the antitrust laws) and "competitive injury" (the diversion of sales and profits from Plaintiffs to Defendants' favored purchasers).

2.      Plaintiffs also sue Defendants Wave and Bernard for their actions tortiously interfering with Plaintiffs' existing and prospective contractual and business relationships that, but for Defendants' conduct, would have continued.  More specifically, Wave paid bribes and kickbacks to Nortek employees, including Bernard, with the express intent of obtaining Nortek products at below market prices and with the intent of stealing away Plaintiffs' existing customers.  Moreover, Wave paid bribes and kickbacks to Nortek employees, including Bernard, with the express intent of shifting Nortek business from Plaintiffs to Wave.  In part, the bribes and kickbacks paid to Nortek employees were to compensate them for providing leads on potential customers for Wave, who were the existing customers of Plaintiffs and other distributors.  Wave's and Bernard's tortious actions caused Plaintiffs to suffer actual damages from lost customers and sales.  Plaintiffs also seek recovery of exemplary damages against

Defendants under Tex. Civ. Prac. & Rem Code §41.001, *et seq.*  Because Defendants' conduct constitutes commercial bribery under Tex. Penal Code §32.43, the statutory caps on the amount of exemplary damages do not apply.  Tex. Civ. Prac. & Rem. Code §41.008(c)(9).

**PARTIES**

**Security Data Supply – The Aggrieved Distributor**

3.      Plaintiff, Security Data Supply, LLC ("SDS"), is a Limited Liability Company organized under the laws of the State of Louisiana.  SDS's principal place of business is located at 421 North Florida Street, Covington, LA 70433.

4.      Security Data Supply, LLC is a wholesale distributor of CCTV, intrusion alarm systems, access control, fire alarms and home automation systems that distributes product, including, but not limited to, the "Nortek Products" which are subject to this action, to retailers and installers nationally via online sales and ten branches/franchises located throughout the southeastern portion of the United States.

5.      Plaintiff, SDS of New Orleans, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Louisiana.  SDS of New Orleans's principal place of business is located at 3204 48th Street, Metairie, LA 70001.

6.      Plaintiff, SDS of Baton Rouge, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Louisiana.  SDS of Baton Rouge's principal place of business is located at 10652 Alco Ave., Baton Rouge, LA 70816.

7.      Plaintiff, SDS of Mandeville, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Louisiana.  SDS of

Mandeville's principal place of business is located at 530 Asbury Drive, Suite B, Mandeville, LA 70471.

8.      Plaintiff, SDS of Monroe, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Louisiana.   SDS of Monroe's principal place of business is located at 805 Drago Street, West Monroe, LA 71291.

9.      Plaintiff, SDS of Bossier City, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Louisiana.   SDS of Bossier City's principal place of business is located at 4004 Shed Road, Bossier City, LA 71111.

10.     Plaintiff, SDS of Dallas, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Texas.   SDS of Dallas's principal place of business is located at 2225 East Beltline Road, Suite 205, Carrollton, TX 75006.

11.     Plaintiff, SDS of Houston, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Texas.   SDS of Houston's principal place of business is located at 10202 Fairbanks N. Houston, Houston, TX 77064.

12.     Plaintiff, SDS of San Antonio, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Texas.   SDS of San Antonio's principal place of business is located at 403 Ramsey Road, Suite 101, San Antonio, TX 78216.

13.     Plaintiff, SDS of Jackson, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Mississippi.   SDS of Jackson's principal place of business is located at 505 Julienne Street, Jackson, MS 39201.

14.     Plaintiff, SDS of Mobile, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Alabama.  SDS of Mobile's principal place of business is located at 3350 Halls Mill Road, Suite #D, Mobile, AL 36606.

15.     Plaintiff, SDS of Central Texas, LLC, a franchisee of Security Data Supply, LLC, is a Limited Liability Company organized under the laws of the State of Texas.  SDS of Central Texas' principal place of business is located at 403 E. Ramsey Road, Suite 101, San Antonio, TX 78216.

**Nortek Security and Control – The Discriminating Manufacturer**

16.     Defendant, Nortek Security and Control, LLC ("NSC" or "Nortek") is a Limited Liability Company organized under the laws of the State of California. Defendant NSC's principal place of business is located at 1950 Camino Vida Roble, Suite 150, Carlsbad, CA 92008.

17.     NSC is a manufacturer of security, home automation and personal security systems, including, but not limited to, 2GIG security products, and is the alleged leader in wireless security, home automation and personal safety systems and devices having deployed more than 4 million commercial, residential and personal security systems.

18.     NSC sells its products through a distribution chain where it sells its products to wholesale distributors such as SDS and Wave Electronics, Inc.  These wholesale distributors then sell the product to retailers and installers who provide the equipment to end users.  These wholesale distributors, including SDS and Wave, are direct competitors of each other.

19.     NSC maintains a 10% market share of the $2.95 billion intrusion alarm security market, and is third only to Honeywell International and Tyco.

20.     NSC is the sole manufacturer of 2GIG – Security and Control systems, an intelligent connected system for residential intrusion detection ("Nortek Products").

**Wave Electronics, Inc. – The Preferred Purchaser and Corporate Briber**

21.     Defendant, Wave Electronics, Inc.  ("Wave" and "Preferred Purchaser") is a corporation organized under the laws of the State of Texas. Defendant Wave's principal place of business is located at 8648 Glenmont Drive, Suite 130, Houston, Texas while managing branches located in Texas, Louisiana, Florida, California, Arizona and New York.

22.     Wave is a wholesale distributor of networking, audio, CCTV, intrusion alarm systems, access control, fire alarms and home automation systems that distributes product to retailers and installers nationally via online sales and eleven branches located in Texas, Louisiana, Florida, California, Arizona and New York, including, but not limited to, the Nortek Products which are subject to this action.

23.     Wave, like SDS, is a distributor of NSC's 2GIG – Security and Control Systems. Wave, like the SDS Franchisees, also resells Nortek Products to retailers.  Accordingly, Wave is a direct competitor of SDS and the SDS Franchisees with respect to the marketing and sale of Nortek Products, and remains a direct competitor of Plaintiffs in the marketing and sale of security and control systems, in general, and specifically, within the geographic areas where the marketing territories overlap, as well as the entire United States for online sales.  Plaintiffs and Wave compete for business from the same customers in the same distribution chain.

24.     Plaintiffs have been unable to successfully compete with Wave since October 2015 due to the Defendants' wrongful conduct, as herein below described, including Wave's regular bribes in the form of cash, American Express cards, and electronics, and/or other goods or services to manufacturers and dealers.

**Earnest Bernard – One of the Recipients of the Bribes**

25.     Defendant, Earnest Bernard ("Bernard") is a former employee of NSC who is a resident of North Richland, Texas who worked in NSC's Texas based office.  He is currently employed by Qolsys and lives at 6508 Parkway Avenue, North Richland Hills, TX 76182.

26.     Bernard worked as NSC's sales representative selling 2GIG products to both SDS and Wave.  While employed by, and on behalf of, NSC, Bernard provided Wave with unlawfully low, discriminatory  pricing via a significant unpublished rebate allowing Wave to price its 2GIG products for sale to retail customers at a price that was less than SDS' wholesale price.  Wave referred to this anti-competitive program as the "Four Star Program."

27.     NSC's corporate management was aware that Bernard was providing this unlawful pricing to Wave to the detriment of NSC's other wholesale distributors.

28.     In return for NSC allowing Wave's anti-competitive pricing, Bernard accepted corporate bribes from Wave consisting of payments and American Express gift cards. *See Exhibit C*, transcript of telephone conversation with Mike Rempe.

29.     NSC, Wave, and Bernard have all conspired with each other to commit intentional or willful acts destroying the competitive market for Nortek Products against SDS and are answerable, *in solido*, for the damage caused by such acts.

## JURISDICTION AND VENUE

30.     This Court possesses subject matter jurisdiction under 28 U.S.C. §§1331 & 1337 over Plaintiffs' claims asserted under the Robinson-Patman Act, 15 U.S.C. §13, et. seq., and Clayton Act, 15 U.S.C. §15. This Court possesses supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

31.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) & (3), and 28 U.S.C. §1391(c) & (d), in that the defendants are subject to personal jurisdiction in this District, and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

**FACTS**

**Plaintiffs and Wave are Direct Competitors and Distributors of NSC Products**

32.     SDS and Wave are authorized manufacturer distributors of the 2GIG security equipment manufactured by NSC. NSC distributes its 2GIG line of products from facilities and offices located in California and Colorado.

33.     SDS has been in the business of distributing NSC, and their predecessors' products, since 2004. SDS is a franchisor that sells some products direct to retailers and consumers, but also distributes products to the SDS Franchisees, who in turn sell directly to retailers and consumers.

34.     SDS franchisees regularly received training, sales calls, and confidential pricing from Nortek.

35.     Wave is an entity that is new to the business of distributing Nortek Products, as it formerly served solely as a distributor of consumer audio and video products. Wave first became involved as a distributor of NSC's 2GIG products in 2015 when it made the decision to sell the 2GIG line of products.

36.     Wave directly competes against SDS and the SDS Franchisees, targeting the identical market of product installers and retailers in geographic regions that overlap. Due to internet sales, both SDS and Wave compete in all fifty states distributing security panels to an infinite number of retail dealers and installers. Furthermore, the brick and mortar retail outlets for

both SDS Franchisees and Wave cover similar territories that overlap each other, predominately in the states of Louisiana and Texas.

37.     As the manufacturing and distribution of the 2GIG products from NSC originate in California and Colorado, and Plaintiffs and Wave maintain outlets in both Texas and Louisiana, the sale and distribution of NSC electronics to both Plaintiffs and Wave cross state lines and fall within the category of interstate commerce. The relevant sales/ transactions referenced herein were all made across state lines.

38.     In less than two years, Wave became the largest purchaser of 2GIG products from Nortek, particularly through Nortek's participation in Wave's "Four Star Program."  Wave's rapid acquisition of market share of 2GIG products was achieved because Nortek provided Wave with special pricing via a rebate program that provided Wave with a rebate on all security products purchased by Wave from Nortek.

39.     After Plaintiffs became aware that Wave was selling its Nortek products at a retail price that was well below the wholesale price offered to Plaintiffs and heard that Wave was receiving special pricing from Nortek, Nortek, through its representative Bernard, specifically denied that Nortek was providing Wave with any special pricing.

**Wave and NSC Conspired to Provide Low, Discriminatory Pricing to Wave**

40.     The 2GIG products referenced in this Complaint are identical products that are of like grade and quality.

41.     Nortek intentionally discriminated in price between SDS and Wave with respect to the pricing of 2GIG products.

42.     For years, Plaintiffs purchased equipment from NSC pursuant to terms similar to those provided to Plaintiffs' competitors that also sold similar Nortek Products.

43.     Pursuant to those terms, each supplier competed with the others based upon price, delivery, credit terms, location and customer service.

44.     NSC's terms were consistent and only varied in limited circumstances when Nortek Products were being sold to special dealers that purchased an extraordinary volume of NSC equipment. The special pricing for these extraordinary retailers was negotiated through wholesalers such as SDS or Wave.

45.     After Wave entered this market, Wave and Nortek created a program named the "Four Star Program" where they would provide Wave's retail customers Nortek products at extremely low prices that were made possible because Nortek agreed to provide Wave, the Preferred Purchaser, with a special rebate that allowed Wave to sell the product to its retail customers below the wholesale prices provided to Nortek's other distributors such as SDS. This special Four Star Program pricing provided for a standard sales price but provided a significant rebate that was kicked back to Wave, the Preferred Purchaser, after the sale was complete, thereby enabling Wave to still earn a significant profit.

46.     As a result of the rebate scheme, the pricing that NSC provided to Wave for these Four Star retailers was significantly lower than the prices offered to SDS, and Wave's other competitors. In fact, Wave's published retail sales price for similar products was significantly less than the wholesale price that NSC sold similar equipment to SDS. *See Exhibit A in globo*, which shows Wave's retail price of 2GIG products to its customer to be $10.80 cheaper than SDS's cost to purchase the items from NSC. Hence, Wave can sell the product to its customer for less than SDS can purchase from the manufacturer.

47.     Wave and NSC conspired to put nearly all of Wave's customers in the rebate program, obtaining unlawful pricing and rebates for all of Wave's customers, both in Wave's

physical territory, as well as nationally via its web site as evidenced by Exhibit A(2).  As such, all of Wave's customers fell within the scope of the program, and Wave was provided unlawful pricing and rebates on all of the Nortek Products that it purchased from NSC.

48.    NSC was, at all times, aware that Wave was misusing the Four Star Program to secure artificially low pricing and rebates for its customers that did not meet the requirements to obtain special pricing. *See Exhibit B*, transcript of telephone conversation between Bill Donahue, VP of Sales at NSC and Ron Broussard. NSC knew it was giving a distinctive advantage to Wave with the exclusive rebate program / special pricing, which began in October 2015, to the detriment of its other distribution partners, and that NSC could get in trouble. *See Exhibit B.*

49.    When SDS inquired about receiving similar pricing, NSC denied the existence of the special pricing/rebate program. In March of 2017, Bernard spoke with Ron Broussard, the owner of Security Data Supply, LLC via telephone and specifically told him that both SDS and Wave received Nortek's Tier 1 Pricing, Nortek's best price, and that all of the distributors were paying the same for Nortek's products—emphatically stating that "I'm not lying to you.  I'm telling the truth."

50.    During this call, Bernard also acknowledged that the SDS Franchisees were training customers on the benefits and use of the Nortek product and then losing the customers, and potential customers, to Wave because of pricing.

51.    During this telephone call, Bernard and Broussard agreed to meet later that month with Dan Geiger, another Nortek employee, at the ISC trade show in Las Vegas to discuss the problems associated with Wave selling product at retail for prices lower than the wholesale price offered to SDS.

**NSC Employees Knowingly Accepted Bribes; NSC Officers Allowed the Discriminatory Pricing to Continue for Fear of Losing Its Preferred Distributor, Wave**

52.     NSC and its employees, were active participants in this scheme in an attempt to push a higher percentage of its product through Wave, its Preferred Purchaser, as Wave was providing NSC, through its employees, with corporate bribes and kickbacks to have them overlook the misrepresentations required to make the Four Star Program the standard pricing for Wave's customers.

53.     Earnest Bernard, Jeff Dickerson, and Adam Kreuger were three NSC employees and agents who accepted cash, American Express gift cards, and other items of value from Wave in exchange for preferential pricing and providing customer leads to Wave. Indeed, Kreuger specifically requested bribes from Wave once he learned of the items Bernard received from Wave.

54.     Once Nortek's President, Michael O'Neal, learned that Nortek's employees, Bernard, Kreuger and Dickerson, were receiving bribes in return for the perpetuation of this special pricing scheme, Kreuger and Dickerson were immediately fired and Bernard quickly resigned prior to being terminated.

55.     Nevertheless, NSC's senior management knowingly allowed the preferred pricing scheme to continue until at least the end of 2017.

56.     Nortek's President, O'Neal, hired Bill Donahue to investigate the matter to make sure that the discriminatory pricing scheme ended and that all of the distributors purchased the Nortek product on an even playing field. Despite Mr. Donahue informing Nortek's senior management that he identified the illegal pricing scheme, management refused to take action to stop the program and allowed the special pricing scheme to continue for at least 12 more months.

Nortek's senior managers refused to immediately shut down the program as it did not want to upset Wave, its Preferred Purchaser, knowing that if Wave decided to use another manufacturer that significant market share would be lost.

57.     Nortek's fear of halting this illegal pricing scheme was well founded as, due to the allegations included in this lawsuit Nortek has been slowly phasing out this special pricing scheme, and Wave responded by hiring Kreuger as an employee who been working with Earnest Bernard, who is now with Quolsys, a direct competitor of Nortek, to move all of Wave's customers from purchasing Nortek 2GIG products to a similar product provided by Quolsys, who is now offering special pricing to Wave customers that is not available to Plaintiffs.

58.     So, despite Nortek's senior management team becoming aware of the illegal Nortek/Wave rebate scheme, the company allowed the illegal/unfair pricing to continue for at least one more year to avoid upsetting their brand new largest distributor, Wave, despite finding out that the pricing, and Wave's rapid acquisition of market share, was due to the unfair pricing provided in response to Wave's illegal payment of bribes.

**More on How the Bribery Worked**

59.     Wave provide payments directly to NSC employees (including Bernard, Kreuger, and Dickerson) on a regular basis, often monthly.  Wave used American Express Gift Cards as bribery payments as they provided less of a paper trail evidencing the payments.

60.     Wave's former employee who was responsible for obtaining and sending the American Express Gift Cards and maintaining documents regarding the procurement and disbursement of the gift cards, explained how this worked.  At Wave's direction, he would report sales from specific customers that were brought to Wave from specific employees of Nortek. "[T]he sales people that brought us those leads were being kicked back funds with gift cards.

And those gift cards were given out monthly.  They were mailed to individuals' personal homes, and so on and so forth." Wave sent out the gift cards via UPS.

61.     These "leads" brought to Wave were customers and prospects that SDS and SDS Franchisees were losing to Wave because of SDS's inability to compete with Wave on price due to the illegal pricing scheme. In other words, Nortek's employees, who knew the identities of Plaintiffs' customers, were providing those names to Wave as "leads" as part of the kickback scheme.

62.     After SDS brought the illegal pricing scheme to light, Nortek began issuing limited SPR pricing to a handful of SDS' largest customers, including a Mississippi based dealer who was a longstanding client of SDS.  Two days after SDS had Nortek approve this customer's SPR, SDS' customer was approached by Wave's New Orleans Branch's Manager and a high ranking Nortek employee, probably Adam Kreuger, who told the longtime SDS customer that they could get even a better pricing by switching from SDS to Wave. This incident provides an example of how Wave and Nortek conspired to damage SDS' business by attempting to drive all customers to Wave, Nortek's Preferred Purchaser.

63.     As the allegations of this former Wave employee were serious, Plaintiffs set out to confirm his story by using third party documents and data by sending a document subpoena to United Parcel Service (UPS) to confirm that Wave sent packages to Nortek employees' homes as alleged by this Wave employee.

64.     This kickback procedure as outlined by the former Wave employee is confirmed by Wave's records from United Parcel Service that confirm that packages were sent on a routine basis to Earnest Bernard, Jeff Dickerson, Adam Kreuger, and possibly other NSC employees who may be revealed during discovery.

65.     For example, Plaintiffs have already confirmed from the UPS records that packages (most likely containing American Express gift cards) were sent to Bernard's home on at least one occasion, Kreuger's home on at least twenty occasions and Dickerson's home on at least nine occasions.  Of course, since Bernard was usually in Houston on Nortek business, he would physically pick up his payments from Wave in person.  A complete listing of the thirty packages sent to Bernard, Kreuger and Dickerson is attached as Exhibit D.

66.     As Wave transmits all of its communications, sales data and transactions to Nortek electronically, and all returned merchandise would be sent to a Nortek warehouse, there is no plausible explanation for Wave sending UPS overnight packages to Nortek employees' homes.  As such, this third party data confirms the former Wave employee's statements that he sent kickbacks directly to these employees in return for the 2GIG customers that these Nortek employees directed to Wave, many of which were Plaintiffs' customers and prospects.

67.     The former Wave employee also confirmed the purpose of the Four Star Program and how it was administered by reporting that "the four-star program was used to attract security dealers to us by giving them a rebate program back. … I was the person there that would submit rebate reports for dealers.  And what that would include is basically sell-through or sell-to, I should say, to specific customers, and then at the end of the month, I would then take those sales to those customers and roll that up in a rebate report that would get submitted to Chris Miller over at Nortek.  And I forget his position over there, but he'd be the one to approve the check or…basically they would issue a credit on our account.  They wouldn't send a check, but he would be the one to approve those sales."

68.     The former Wave employee also confirmed that "Well, I think the genesis of the four-star program and…and its conception is…it is and was built to be able to attract customers

to Wave in the idea that they could be able to purchase a 2gig for cheaper than where they could buy it from anywhere else.  And that was true.  For those dealers that were on that program, they were buying it with rebate for…for less than you could buy it anywhere."

69.     The former Wave employee also confirmed how the bribes/ kickbacks were calculated at the direction of Wave's senior management by stating "A program would be given to me, and that program would be…now this particular rep gets x percent of this particular customer or customers' sales.  And so, all I really did, you know, was look at what the customer purchased from us and then, you know, added a percentage to that…and let's say if it came out to be, you know, $995, then obviously we would send out to that rep a thousand dollars in [American Express] gift cards."

70.     The former Wave employee also confirmed that there were a lot of Nortek employees receiving these bribes, including Bernard and Kreuger, by stating "there were a lot of folks on that list that would get these.  Now…you know, the way it would work is that Earnest may be a portion of a specific customer's sales, but there was a roll-up…and, you know…a roll-up, you know, to Adam.  So, you know, Adam would get an amount of gift cards every month, and…uh…you know?"

71.     Despite Wave sending cash compensation, via gift cards, to Nortek employees, Wave did not report sending these Nortek employees this income to the IRS and as such, these Nortek employees may not have reported this income on their tax returns.

72.     The former Wave employee confirmed that the largest gift cards sent to Nortek employees were for $2,000 per card, the largest amount that American Express sells cards for.

73.     Bernard used the corporate bribes that he received from Wave to pay off his home and vehicle.

74.     NSC and Bernard allowed Wave to perpetuate its scheme of placing virtually all of its dealers into the Four Star Program allowing Wave to receive discriminatory pricing that was not provided to NSC's other distributors such as SDS.

75.     This bribery scheme, and the acceptance of Wave's Four Star Program as day to day pricing provided to Wave, was done with the knowledge of Wave and Wave's senior management. This bribery scheme was also done with the knowledge of NSC' agents. Further, even after knowledge of this scheme was revealed and some of the employees caught accepting bribes were terminated, NSC continued the Four Star Program for several months until the end of 2017.

**Wave Obtained Preferential Pricing from NSC by the Implementation of a Rebate Program that was made Available to all Wave Customers**

76.     NSC executives and managers have discussed their knowledge of the Four Star Program scheme with representatives of SDS on several occasions, admitting that they had knowledge of the program, that the program provided for unfair competition, was illegal and needed to be stopped. *See Exhibit B.*

77.     NSC consulted with outside counsel who informed them that the acceptance of the Four Star Program, and its discriminatory pricing scheme, was a violation of United States Antitrust law and needed to be stopped right away.

78.     In April of 2017, NSC's Chief Operating Officer Michael O'Neal, met with SDS' President, Ron Broussard, in Las Vegas, Nevada and discussed the anti-competitive nature of the Four Star Program. NSC's CEO admitted that the Four Star Program was being abused by Wave and promised that NSC would halt the program, and its anti-competitive rebate scheme, right

away. Despite NSC's April 2017 assertion that the program would stop immediately, the program continued long thereafter.

79.     Mr. Broussard also discussed Wave's discriminatory pricing scheme with Rick Campbell, NSC's product representative for both Wave and SDS.

80.     On August 1, 2017, NSC's National Sales Manager, Bill Donahue, notified Wave that the Four Star Program would be disbanded within 30 days. *See Exhibit B*. Mr. Donahue admitted that NSC's outside counsel had instructed NSC's management that the program must be shut down immediately, but NSC's senior managers, including Nortek's President Michael O'Neal, were not interested in shutting the program down immediately and instead wanted to run the scheme through the end of 2017. *See Exhibit B*.

81.     Mr. Donahue further admitted that Wave objected to the discontinuation of the program and contacted Dan Geiger, Senior Vice President of Sales, and Mike O'Neal, NSC's Chief Operating Officer, to request the continuation of the program. Mr. Geiger provided Wave with a continuation of their anti-competitive scheme for all dealers for another sixty days and grandfathered in Wave's top thirty dealers allowing them to continue to utilize discriminatory pricing for a majority of its business. Mr. Donahue admitted that allowing Wave to grandfather in 30 of its best dealers into the ongoing Four Star Program is unfair and would have a detrimental impact upon the relevant market.

82.     NSC's National Sales Manager, Bill Donahue, spoke to SDS' Mr. Broussard on August 25, 2017. Mr. Donahue admitted that (a) Wave was running hundreds of dealers through the Four Star Program (including small ones), (b) NSC was aware that Wave uses the Four Star Program pricing as "their day to day sale price," (c) Wave has enjoyed this special pricing scheme since October of 2015, and (d) that Wave "had a distinct advantage in the marketplace"

and that Wave built their business "at the detriment of some our other distribution partners." *See Exhibit B.*

83.     Mr. Donahue told Wave that what they were doing borders on being illegal, can get Nortek in trouble and must immediately stop. *See Exhibit B.* He admitted that Wave had a distinct pricing advantage against all other 2GIG distributors in the day to day business of selling 2GIG products. *See Exhibit B.* Mr. Donahue admitted to SDS' Mr. Broussard that NSC and Wave's pricing structure was wrong, hurting NSC's reputation in the market, damaging the pricing integrity of the market, and damaging all of NSC's distributor relationships. *See Exhibit B.*

84.     Mr. Donahue brought his concerns to the General Counsel of NSC, Dan Schatz, who admitted that the scheme was illegal and told Mr. Donahue that the scheme had to stop right away. *See Exhibit B.*

85.     Despite Mr. Donahue pleading with NSC to end the pricing program immediately, Chris Miller, Vice President of Strategy and Development, opposed ending the program, even after being admonished by outside counsel that the program is illegal.

86.     NSC continued with this scheme, long after outside counsel notified them that the program was illegal, in an effort to drive Plaintiffs from the market, and allow Wave to retain the market share that it had developed by the use of the Four Star Program.

87.     After NSC refused to end this illegal scheme, Mr. Donahue resigned from Nortek as he did not want to be affiliated with a company that would allow such illegal conduct to continue unabated.

88.     NSC never offered a similar Four Star Program to SDS or the SDS Franchisees.

**Security Data Supply and its franchisees operate as a single unit which excludes the franchisees from the Robinson-Patman Act's Direct Purchaser Rule.**

89.     SDS is a direct purchaser of Nortek Products from NSC.  The SDS Franchisees obtain Nortek Products from or with the assistance of SDS.  Thus, SDS functions as the formal wholesaler, with the SDS Franchisees operating the brick and mortar stores as franchises.  Taken together, SDS and the SDS Franchisees are the functional competitor to Wave, as Wave has merely vertically integrated functions into a single entity, which are handled by SDS and its franchisees in separate entities.  Wave should not be able to avoid antitrust liability to the SDS Franchisees, its direct competitors, simply by adopting a different business form and structure.

90.     The Robinson Patman Act's Direct Purchaser rule should not apply to the SDS Franchisees.  Each of the SDS Franchisees have entered into a franchise agreement where they purchase 100% of their products through Security Data Supply, LLC for a set price based upon a standard mark up on the wholesale price provided to Security Data Supply, LLC from the manufacturer. This business arrangement constitutes a "Cost Plus Contract" where Nortek's overcharging, in this case based upon the Wave rebate scheme, is not absorbed by SDS, the wholesaler, and is passed directly to the franchises. The use of this Cost Plus Contract arrangement between SDS and the franchises provides the franchises with a viable Robinson Patman Act claim pursuant to the Pre-Existing Cost-Plus Contract Exception to the direct purchaser rule.

91.     The SDS business arrangement creates a situation where there is a functional or economic unity between SDS, the wholesaler, and its franchisees making the sale of goods from Nortek to SDS effectively one sale as the activities of the franchises are directly controlled by SDS, another exception to the direct purchaser rule.

92.     In addition to the contractual structure that fits squarely within both the control and cost-plus contract exceptions to the direct purchaser rule, Nortek treated both Security Data Supply, LLC and its franchises as a single enterprise. Each franchise would order the products that it needed directly from Nortek using SDS' account and Nortek would bill SDS while sending the product directly to the franchise, creating one seamless transaction with Nortek. Furthermore, Nortek would communicate directly with the franchises to discuss product promotion and pricing as can be seen from the e-mails attached as Exhibits E & F showing that Nortek representatives would provide the franchises with product pricing spreadsheets that show the wholesale pricing that Nortek provides to SDS. As the franchises operated on a cost-plus contract with SDS, Nortek was free to send its wholesale pricing lists directly to the franchises. *See Exhibits E & F.* Additionally, Nortek representatives would routinely make sales calls directly with the employees from the franchisees as well as attend and coordinate 2GIG training classes that were held at the franchise locations.

**As a Result of Defendants' Discriminatory Pricing Scheme, Competition Has Been Injured and Plaintiffs Have Sustained Significant Financial Losses and Loss of Market Share**

93.     As a result of Defendants' discriminatory pricing scheme to allow Wave an advantage in pricing, competition has been injured. Injury to competition naturally occurs when a favored purchaser's retail price is lower than the wholesale purchase cost of its competitors.

94.     For example, as a result of the price discrimination and NSC'S unfair pricing scheme with Wave, Plaintiffs have lost a significant number of customers to Wave, have been unable to compete with Wave for new potential customers and have suffered significant financial losses including the loss of sales, profits and market share.

95.    Plaintiffs have identified approximately 59 clients that they lost to Wave due to Plaintiffs' inability to match the prices offered by Wave.  The loss of business to Wave continues to grow and this list will grow as long as the prohibited price discrimination  continues. SDS estimates its annual losses for each of the 59 clients and prospective clients as follows:

| SDS Location | Customer | Estimated Annual Volume |
|---|---|---|
| Houston | CSG | $         300,000.00 |
| Houston | Light Speed Security | $         240,000.00 |
| Houston | Datasmart | $           20,000.00 |
| Houston | C.O.C. Surveillance | $           15,000.00 |
| Houston | W&W Telephone | $           10,000.00 |
| Houston | AHS Solutions | $           10,000.00 |
| Houston | Halo Professionals | $           40,000.00 |
| Houston | RAB | $         240,000.00 |
| Houston | Juggernaut Systems | $         180,000.00 |
| Houston | Safeguard Burglar | $         240,000.00 |
| Houston | Golden Gates Security | $         100,000.00 |
| Dallas | Select Security Group | $         180,000.00 |
| Dallas | DFW Security | $      1,200,000.00 |
| Dallas | Vault Security | $         600,000.00 |
| Dallas | Forward Home Security | $      1,080,000.00 |
| Dallas | The Chron Organization | $         240,000.00 |
| Bossier | United Automation | $         250,000.00 |
| Bossier | ASG Monroe | $         100,000.00 |
| Bossier | Allied Security Technology | $         100,000.00 |
| Bossier | Alarmco | $           50,000.00 |
| Bossier | Security Pro | $           80,000.00 |
| Bossier | Modern Security | $           35,000.00 |
| Bossier | Cam-Tech | $           35,000.00 |
| Bossier | Smart Security | $           35,000.00 |
| Baton Rouge | Elite Solutions | $         100,000.00 |
| Baton Rouge | A-1 Security | $           30,000.00 |
| Baton Rouge | Heavenly Homes | $           30,000.00 |
| Baton Rouge | DMI | $           30,000.00 |
| Baton Rouge | Smart Homes of La | $         120,000.00 |
| Baton Rouge | Louisiana Custom Media | $         120,000.00 |
| Baton Rouge | Custom Security | $         400,000.00 |
| Mandeville | LA Nationwide | $         120,000.00 |
| New Orleans | USA Fire and Burg | $         750,000.00 |
| New Orleans | Lynk Security | $         100,000.00 |

| | | | |
|---|---|---|---|
| New Orleans | Top Notch Security | $ | 75,000.00 |
| New Orleans | Safe and Secure | $ | 75,000.00 |
| New Orleans | State of the Art | $ | 50,000.00 |
| New Orleans | Alpha Security | $ | 100,000.00 |
| New Orleans | ABC Security | $ | 175,000.00 |
| New Orleans | Crescent City Electonics | $ | 50,000.00 |
| New Orleans | Sound Creation | $ | 100,000.00 |
| New Orleans | Tassin Security | $ | 100,000.00 |
| New Orleans | Hallock Security | $ | 50,000.00 |
| New Orleans | Eagle Security | $ | 50,000.00 |
| New Orleans | Home Protection | $ | 50,000.00 |
| New Orleans | Major Security | $ | 75,000.00 |
| New Orleans | Savoie Security | $ | 100,000.00 |
| New Orleans | Pro A/V | $ | 50,000.00 |
| New Orleans | BP Security | $ | 50,000.00 |
| New Orleans | Texas Fire | $ | 125,000.00 |
| New Orleans | Digitech Security | $ | 50,000.00 |
| New Orleans | Hi Tech Smart Homes | $ | 50,000.00 |
| Mobile | IET | $ | 60,000.00 |
| Mobile | ASAP | $ | 150,000.00 |
| Mobile | Tapper | $ | 200,000.00 |
| Mobile | Watchtower | $ | 60,000.00 |
| Mobile | Trio Alarm | $ | 200,000.00 |
| Mobile | Persich | $ | 75,000.00 |
| Mobile | Prostar | $ | 75,000.00 |
| Mobile | Securimax | $ | 200,000.00 |
| | **TOTAL** | **$** | **9,575,000.00** |

96.     These losses are annual losses.  In addition, SDS has lost other business that they have not yet been able to quantify as of the filing of this Complaint.  Discovery likely will reveal additional lost customers across the relevant geographic area.

97.     Defendants' actions have also impacted Plaintiffs' ability to attract new customers.  For example, SDS has recently opened an outlet in San Antonio, Texas. Although the San Antonio store is a distributor of Nortek products, SDS has not been able to sell a single

piece of Nortek Products in this market because Wave is offering the Nortek Products for sale at prices 40% below the wholesale price that NSC sells the equipment to SDS.

98.      Plaintiffs have discovered that the substantial decreases in market share which it experienced in the sale of Nortek Products was and remains the proximate result of Defendants' price discrimination and other unlawful conduct. Plaintiffs' drop in Nortek Product sales was instigated and promoted by Defendants' actions, including unfair pricing and corporate bribery. Due to Nortek's illegal pricing program that favors Wave over all other distributors, there remains only one significant distributor of Nortek Products therein, Nortek's favored purchaser, Wave.

99.      The effect of this illegal pricing scheme can be conclusively proven by looking at SDS' sales of Nortek's 2GIG products after SDS filed this suit and Nortek reluctantly began providing SDS with more competitive pricing in July 2017. SDS sales of 2GIG products increased 40% between July and December 2017, when the only difference in the competitive environment was Nortek's slow process of tamping down Wave's unfair price advantage.  If SDS would have been allowed to continue selling 2GIG products in 2018, SDS would have continued re-gaining the market share that Wave stole from it based upon this illegal pricing scheme.

100.     Furthermore, after SDS filed this lawsuit attempting to halt this illegal pricing scheme, in January 2018, Nortek pulled the 2GIG, Lanier, Core Brands and Proficient lines from SDS without providing SDS with any notice, much less the contractually required notice of termination,  or allowing SDS to return the Nortek products in its inventory that SDS was no longer authorized to sell.

101.    SDS offered to pay all of the outstanding invoices issued by Nortek and its subsidiaries once it received proper credit for the return of the unsaleable merchandise. However, Nortek refused to accept the return of this unsalable merchandise and instead filed a retaliatory lawsuit in Sonoma County, California seeking the collection of the past due invoices.

102.    In addition to the damages sustained by Plaintiffs related to the illegal pricing scheme, Nortek's retaliatory cancellation of four different lines of ancillary products that SDS and the SDS Franchisees had marketed for a long time caused additional financial damages and pushed even more potential customers to Wave as Wave also sold these ancillary products on Nortek's behalf.

## CAUSES OF ACTION

## COUNT I -- VIOLATIONS OF 15 U.S.C. §13(a) (Robinson-Patman Act)

### (Asserted by All Plaintiffs against Nortek)[1]

103.    Plaintiffs re-allege and incorporate by reference all the prior allegations and paragraphs contained in this Complaint.

104.    At all relevant times hereto, NSC, Wave and Bernard were, and continue to be, persons engaged in interstate commerce, as defined by 15 U.S.C. §13 of the Robinson-Patman Act.

105.    During the relevant time periods herein and continuing through the present time, NSC manufactured and sold, and continues to manufacture and sell the Nortek Products through SDS and Wave.

106.    At all relevant times hereto, NSC has manufactured and sold the Nortek Products in commerce to numerous distributors and customers located throughout the United States, many

---

1 When Nortek filed its motion to dismiss the First Amended Complaint, it did not challenge this claim.

of whom are in direct competition with SDS, including, but not limited to Wave, the Preferred Purchaser.

107.    At all relevant times hereto and continuing through the present time, SDS has purchased large quantities of the Nortek Products from NSC for resale to SDS' customers and to the SDS Franchisees' customers.

108.    At all relevant times hereto and as more particularly described herein, NSC, in the course of commerce has sold, and is continuing to sell, Nortek Products to Wave, the Preferred Purchaser - commodities of like grade and quality to those sold by NSC to SDS at discriminatory prices which prices were, and remain, substantially less than NSC charged, and presently is charging, to SDS for the identical Nortek Products.

109.    These commodities of like grade and quality include the 2GIG products. *See Exhibit A in globo*, pricing lists for Wave products and SDS products.

110.    As more particularly described herein above, and in the course of commerce, NSC has sold Nortek Products, and/or commodities of like grade and quality, to Wave, the Preferred Purchaser, granting to them rebates, discounts and other allowances, and/or "special" financing terms, which were not disclosed to, offered to, or given to SDS or the SDS Franchisees.

111.    Wave's preferred pricing through rebates, discounts, other allowances, and/or "special" financing terms began in October 2015 and occurred with Wave's multiple transactions with NSC, including during the time SDS purchased commodities of like grade and quality from NSC.

112.    This discriminatory price discrimination scheme resulted from Wave's bribery of NSC's agents and employees, including, but not limited to, Earnest Bernard, Jeff Dickerson and Adam Kreuger.

113.    This discriminatory pricing scheme resulted in a difference in price.

114.    NSC continued this price discrimination through the end of 2017, even after learning of its employees' bribery, and, upon information and belief, may still be in place today, despite NSC's knowledge that such a scheme is illegal.

115.    The retail price to Wave's customers was $10.80 less than SDS' wholesale purchase price of the same exact items from NSC. In essence, Wave was able to sell the 2GIG items for less than SDS could purchase them.

116.    Thus, NSC offered Wave the benefits of discriminatory pricing with a substantial price difference that was maintained over a substantial period of time, which resulted in harm to competition.

117.    NSC's discriminatory pricing and related illegal discriminatory practices were not, and are not, justified based upon any differences in the cost of manufacture, sale or delivery resulting from any differing methods or quantities in which the subject commodities were, or are, sold or delivered to SDS or the SDS Franchisees, as compared to the Preferred Purchaser of Nortek Products, or products of like grade and quality.

118.    NSC's discriminatory  pricing and related illegal discriminatory practices as aforesaid with respect to its sales of Nortek Products, or as to its sales of commodities of like grade and quality, were not, and are not, justified based upon changing conditions affecting the market for, or the marketability of, the goods concerned.

119.    SDS, the SDS Franchisees, and their competitors, including the Preferred Purchaser, market and sell both the Nortek Products and other electronics to the same customers, and did so contemporaneously during the relevant time periods herein.

120.    As a result of NSC's discriminatory  pricing and related illegal discriminatory practices with respect to their sales of Nortek Products, SDS and the SDS Franchisees effectively have been precluded from selling Nortek Products and other electronics to certain of its customers, and/or have suffered a substantial decrease in sales and profits to many of its customers.

121.    As a direct and proximate result of the discriminatory pricing and related illegal practices being engaged in by NSC, with respect to the Preferred Purchaser, Plaintiffs' ability to compete with the Preferred Purchaser (and perhaps other favored distributors) for sales of the Nortek Products to Plaintiffs' customers has been substantially diminished, and, Plaintiffs' ability to compete with the Preferred Purchaser has been totally eliminated.

122.    The effect of NSC's discriminatory actions and unfair business conduct has been substantially to lessen competition in the affected line of commerce, and particularly in the areas where Plaintiffs' and Wave's markets overlap.

123.    NSC's discriminatory actions and unfair business conduct have injured, destroyed and/or prevented fair competition in the marketplace.

124.    NSC's discriminatory actions and unfair business conduct have injured, destroyed and/or prevented fair competition, including but not limited to competition, among Plaintiffs and their competitors, and particularly in the areas where Plaintiffs' and Wave's markets overlap.

125.    NSC's discriminatory actions and unfair business have injured, destroyed and/or prevented fair competition between Plaintiffs, and other distributers, and the Preferred Purchaser competitor, who have received the benefit of NSC's price discrimination and related improper sales practices.

126.    NSC's discriminatory actions and unfair business conduct have injured, destroyed and/or prevented fair competition, including but not limited to competition among Plaintiffs' and its competitors' customers.

127.    NSC's illegal actions, price discrimination and unfair business conduct as referenced herein constitute multiple violations of the Robinson-Patman Act, including, but not limited to, 15 U.S.C. §13(a).

128.    As a proximate result of NSC's illegal actions, price discrimination and unfair business conduct as referenced herein, Plaintiffs have suffered substantial economic losses and other damage to its business, reputation and customer goodwill, including, but not limited to, lost sales and profits.

### COUNT II -- VIOLATIONS OF 15 U.S.C. §13(f) (Robinson-Patman Act)

### (Asserted by All Plaintiffs against Wave)[2]

129.    Plaintiffs re-allege and incorporate by reference all the prior allegations and paragraphs contained in this Complaint.

130.    Section 13(f) of the Robinson Patman Act provides:  "It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section."

131.    Wave, being a "person" engaged in commerce, in the course of such commerce as described above, knowingly induced (and is continuing to induce), and/or knowingly received (and is continuing to receive), discriminations in the prices of Nortek Products by and/or from NSC.  That is, Wave has knowingly induced the violation of Section 13(a) of the Robinson Patman Act that is alleged in Count I, as well as knowingly induced the violation of Section

---

2 When Wave filed its motion to dismiss the First Amended Complaint, it did not challenge this claim.

13(c) of the Robinson Patman Act alleged in Count III, and knowingly received the benefit of those violations.

132.    The effect of Wave's illegal actions and unfair business conduct as referenced herein has been to create a discrimination in price between competitors, specifically Wave received a substantially lower price than SDS, the SDS Franchisees, and other competitors, on commodities of like grade and quality.  Wave received that substantially lower price over a substantial period of time, resulting in harm to competition.

133.    Wave knowingly induced (and is continuing to induce), and/or knowingly received (and is continuing to receive) the prohibited discrimination in price, in part or in whole, in exchange for: (i) NSC's agreement to provide Wave with Nortek products below its competitors' costs; (ii) Wave providing NSC representatives, including but not limited to, Bernard and Kreuger, complimentary gifts, services, meals, etc; and (iii) Wave providing bribes to NSC representatives, including but not limited to, Bernard, cash payments via the delivery of checks, cash and American Express gift cards.

134.    The effect of Wave's discriminatory actions and unfair business conduct as referenced herein has been substantially to lessen competition in the affected line of commerce.

135.    Wave's discriminatory actions and unfair business conduct as aforesaid have injured, destroyed and/or prevented fair competition, including but not limited to competition among SDS and the SDS Franchisees, the Preferred Purchaser and perhaps other favored distributors, who have received the benefit of NSC's price discrimination.

136.    Wave's discriminatory actions and unfair business conduct have injured, destroyed and/or prevented fair competition, including but not limited to competition among Plaintiffs' and its competitors' customers.

137.    Wave's discriminatory actions, knowing inducement and/or receipt of discriminatory pricing and unfair business conduct as aforesaid constituted and/or caused multiple violations of the antitrust laws of the United States including, but not limited to, of the Robinson Patman Act, 15 U.S.C. §13(a) and 15 U.S.C. §13(f).

138.    As a direct and proximate result of Wave's illegal actions, knowing inducement and/or receipt of discriminatory pricing and unfair business conduct as aforesaid, Plaintiffs have suffered substantial economic losses and other damage to their business, reputation and customer goodwill, including, but not limited to, lost sales and profits.

### COUNT III -- CORPORATE BRIBERY, 15 U.S.C. §13(c) (Robinson-Patman Act)

### (Asserted by all Plaintiffs Against All Defendants)

139.    Plaintiffs re-allege and incorporate by reference all the prior allegations and paragraphs contained in this Complaint.

140.    Section 13(c) of the Robinson Patman Act provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

141.    An employee commits the offense of commercial bribery if, he intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person on agreement or understanding that the benefit will influence his conduct in relation to the affairs of his employer.

142.     The offense of commercial bribery is complete once the employee accepts the benefit or agrees to have his conduct influenced by a benefit, whether or not the employee subsequently acts in furtherance of the agreement.

143.     Bernard, Dickerson and Kreuger, , and possibly several other NSC employees, while they were employees and agents performing the work of their employer, NSC, accepted cash, checks, American Express gift cards and other items of value from Wave.

144.     Wave knowingly provided these items of value to Bernard, Dickerson and Kreuger, and possibly several other NSC employees, to influence their conduct in relation to Wave's to implementation of its Four Star Program allowing Wave to include all of its small dealers into a single dealer that qualified for NSC's special pricing and rebates.

145.     Bernard negotiated the special terms between Wave and NSC as a result of Wave making the corporate bribes that were accepted by Bernard, and possibly other NSC employees.

146.     With its bribery scheme, Wave knowingly induced and received a prohibited discrimination in price to the detriment of competition in the market.

147.     Once NSC became aware that Bernard was accepting corporate bribes, Bernard resigned from NSC's employment.

148.     After Bernard resigned due to the bribery scandal, NSC terminated Bernard's direct supervisor, Adam Kreuger.

149.     Despite terminating Bernard, Dickerson and Kreuger for accepting these bribes, NSC managers have allowed the special pricing and rebates provided to Wave to continue.  As such, NCS is complicit in the act of bribery as it continues to accept Wave as a Favored Purchaser under terms that its counsel stated should be discontinued.

150.     As a result of the bribes paid by Wave to Bernard, Dickerson and Kreuger, and possibly several other NSC employees, Wave received special pricing, which resulted in SDS paying a higher price for its goods.

151.     As a direct and proximate result of the Defendants' corporate bribery scheme, Plaintiffs have suffered damages, and will continue to suffer damages. Plaintiffs are therefore entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorney fees.

**COUNT IV – Tortious Interference with Business Relationship with Nortek**

**(Asserted by SDS Against Wave and Bernard)**

152.     Plaintiffs re-allege and incorporate by reference all the prior allegations and paragraphs contained in this Complaint.

153.     SDS had an ongoing and existing business relationship with Nortek under which SDS acquired Nortek Products for itself and the SDS Franchisees for resale to their retailers and customers.   SDS derived substantial business and revenues from that relationship, and anticipated that it would continue.

154.     Wave and Bernard intentionally interfered with SDS' existing and prospective business relationship with Nortek by engaging in a bribery and kickback scheme to obtain leads for Wave consisting of Plaintiffs' customers and to obtain favorable pricing terms so that Wave could unfairly compete against Plaintiffs when trying to steal Plaintiffs' customers.   Wave and Bernard had no privilege or legitimate justification for doing so.

155.     Wave's and Bernard's conduct was independently tortious and unlawful.   Bernard was a Nortek employee and, thus, a "fiduciary" under Tex. Penal Code §32.43(a)(2).   Nortek was a "beneficiary" under Tex. Penal Code §32.43(a)(1).   Under Tex. Penal Code §32.43(b), "[a]

person who is a fiduciary commits an offense if, without the consent of his beneficiary, he intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary."  Under Tex. Penal Code §32.43(c), "[a] person commits an offense if he offers, confers, or agrees to confer any benefit the acceptance of which is an offense under Subsection (b)."   As explained above, Bernard and other Nortek employees knowingly and intentionally accepted benefits from Wave to influence their conduct to benefit Nortek by providing customer leads and favorably prices, to the detriment of Plaintiffs and other distributors, which violated Section 32.43(b).   By offering such bribes and benefits, Wave violated Section 32.43(c).   Nortek's lack of consent to its employees accepting bribes is shown by Nortek's decision to fire its employees who were caught accepting the payments.

156.   Bernard also acted in an independently tortious way toward SDS when he lied to SDS about the existence of the favorable pricing being provided to Wave when SDS' Mr. Broussard specifically asked him about this in March of 2017.   Bernard made his false statements to Mr. Broussard with an intent to deceive, and thereby continue the unlawfully bribery and kickback scheme that was causing substantial harm to Plaintiffs' business.

157.   As a direct result of Wave's and Bernard's conduct, Plaintiffs lost many customers, 59 of whom are listed in paragraph 94 above.   This, in turn, costs SDS to lose significant business under its existing contractual relationship with Nortek.   But for Wave's and Bernard's tortious conduct, SDS would not have lost this business.

158.   SDS seeks recovery of the actual damages it has suffered as a result of Wave's and Bernard's tortious interference.   Because Wave's and Bernard's actions were fraudulent, malicious, and grossly negligent, SDS also seeks an award of punitive damages under Tex. Civ.

Prac. & Rem. Code §41.003.  Moreover, because Wave's and Bernard's conduct violated Tex.

Penal Code §32.43(b) & (c), the statutory caps on punitive damages do not apply.  Tex. Civ.

Prac. & Rem. Code §41.008(c)(9).

159.    Wave and Bernard acted in concert, and as part of a conspiracy, to interfere with

SDS' business relationships.  Thus, they are jointly and severally liable for the harm they caused.

**COUNT IV – Tortious Interference with Business Relationships with Customers**

**(Asserted by All Plaintiffs Against All Defendants)**

160.    Plaintiffs re-allege and incorporate by reference all the prior allegations and

paragraphs contained in this Complaint.

161.    SDS and the SDS Franchisees had ongoing and existing business relationships

with retailers and customers, 59 of whom are identified in paragraph 94 above.  SDS and SDS

Franchisees derived substantial business and revenues from those relationships, and anticipated

that they would continue.

162.    Nortek, Wave, and Bernard intentionally interfered with Plaintiffs' existing and

prospective business relationships with the 59 customers identified above (and likely others) by

providing leads to Wave consisting of Plaintiffs' customers and favorable pricing terms so that

Wave could unfairly compete against Plaintiffs when trying to steal Plaintiffs' customers.

Nortek, Wave, and Bernard had no privilege or legitimate justification for doing so.

163.    Wave's and Bernard's conduct was independently tortious and unlawful.  Bernard

was a Nortek employee and, thus, a "fiduciary" under Tex. Penal Code §32.43(a)(2).  Nortek was

a "beneficiary" under Tex. Penal Code §32.43(a)(1).  Under Tex. Penal Code §32.43(b), "[a]

person who is a fiduciary commits an offense if, without the consent of his beneficiary, he

intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person

on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary."  Under Tex. Penal Code §32.43(c), "[a] person commits an offense if he offers, confers, or agrees to confer any benefit the acceptance of which is an offense under Subsection (b)."   As explained above, Bernard and other Nortek employees knowingly and intentionally accepted benefits from Wave to influence their conduct to benefit Nortek by providing customer leads and favorably prices, to the detriment of Plaintiffs and other distributors, which violated Section 32.43(b).   By offering such bribes and benefits, Wave violated Section 32.43(c).  Nortek's lack of consent to its employees accepting bribes is shown by Nortek's decision to fire its employees who were caught accepting them.

164.   Nortek and Bernard also acted in an independently tortious way toward Plaintiffs when they lied to SDS about the existence of the favorable pricing being provided to Wave when SDS' Mr. Broussard specifically asked Bernard about this in March of 2017.  Bernard made his false statements to Mr. Broussard with an intent to deceive, and thereby continue the unlawful bribery and kickback scheme that was causing substantial harm to Plaintiffs' business.

165.   Nortek and Bernard also acted in an independently tortious way toward Plaintiffs when, in April 2017, Mike O'Neal lied to SDS and told Mr. Broussard that the unfair pricing scheme would stop immediately when they had no intention to shut down the rebate scheme. Mr. O'Neal made his false statements to Mr. Broussard with an intent to deceive, and thereby continue the unlawful pricing scheme that was causing substantial harm to Plaintiffs' business.

166.   Nortek also acted in an independently tortious manner by misappropriating Plaintiffs' confidential customer identities to provide them for the benefit of a competitor, Wave. Nortek had no authorization to disclose such information learned by Nortek during the course and scope of its business relationship with SDS and the SDS Franchisees.

167.     Nortek and Bernard also acted in an independently tortious way toward Plaintiffs when, Nortek retaliated against SDS for bringing this illegal pricing scheme to light and cancelling four different lines of ancillary products that SDS had marketed for a long time causing additional financial damages due to the loss of additional sales and pushing even more potential customers to Wave as Wave also sold these ancillary products on Nortek's behalf.

168.     As a direct result of Defendants' conduct, Plaintiffs lost many customers, 59 of whom are listed in paragraph 94 above, which caused Plaintiffs' substantial harm.

169.     Plaintiffs seek recovery of the actual damages it has suffered as a result of Defendants' tortious interference.  Because Defendants' actions were fraudulent, malicious, and grossly negligent, SDS also seeks an award of punitive damages under Tex. Civ. Prac. & Rem. Code §41.003.  Moreover, because Wave's and Bernard's conduct violated Tex. Penal Code §32.43(b) & (c), the statutory caps on punitive damages do not apply to them.  Tex. Civ. Prac. & Rem. Code §41.008(c)(9).

170.     Nortek, Wave, and Bernard acted in concert, and as part of a conspiracy, to interfere with SDS' business relationships.  Thus, they are jointly and severally liable for the harm they caused.

**WHEREFORE**, Plaintiffs respectfully requests Final Judgment against the Defendants for the following relief:

(a) an award of compensatory damages;

(b) treble actual damages for each antitrust violation, 15 U.S.C. §15;

(c) exemplary damages for Defendants' state law torts;

(d) an award of reasonable attorney's fees and the costs of suit;

(e) pre-judgment and post-judgment interest;

(f) temporary, preliminary and permanent injunctive relief, enjoining and restraining each of said defendants, and each and all of their subsidiaries, affiliates, shareholders, members, directors, managers, officers, employees, agents, representatives and all persons acting in concert with them or on their behalf, from, directly or indirectly, continuing to engage in price discrimination and other conduct prohibited by the Robinson-Patman Act; and

(g) for such other and further relief, whether of a legal or equitable nature, which the Court deems necessary, proper, and/or required based upon the facts and circumstances presented.

**RESPECTFULLY SUBMITTED:**

**BALDWIN HASPEL BURKE & MAYER, LLC**

*__s/ Lawrence R. DeMarcay, III__*
**DAVID L. CARRIGEE (#3892)**
**LAWRENCE R. DeMARCAY, III (TX#24043513)**
**T.A.**
**STEVEN B. "BEAUX" JONES (TX#24105392)**
**VALERIE E. FONTENOT (#35129)**
1100 Poydras Street, Suite 3600
New Orleans, LA  70163
Telephone:  (504) 569-2900
Fax:  (504) 569-2099
dcarrigee@bhbmlaw.com
ldemarcay@bhbmlaw.com
bjones@bhbmlaw.com
vfontenot@bhbmlaw.com

and

**ROBERT D. HOFFMAN, JR. (#06898)**
7039 Highway 190
Covington, LA 70433
(985) 727-3893
Fax (985) 674-9082
Cell (504) 450-1306
robert@hoffmanplc.com

and

W. Scott Hastings (TX# 24002241)
Susan E. Adams (TX# 24059354)
**LOCKE LORD LLP**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-6776
(214) 740-8000
(214) 740-8800 (facsimile)
shastings@lockelord.com
suadams@lockelord.com

**ATTORNEYS FOR PLAINTIFFS**

*Attorneys for Plaintiffs, Security Data Supply, LLC, SDS of New Orleans, LLC, SDS of Baton Rouge, LLC, SDS of Mandeville, LLC, SDS of Monroe, LLC, SDS of Bossier City, LLC, SDS of Dallas, LLC, SDS of Houston, LLC, SDS of San Antonio, LLC, SDS of Jackson, LLC, SDS of Mobile, LLC, and SDS of Central Texas, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of October, 2018, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: None.

*/s/Lawrence R. DeMarcay, III*