# United States District Court
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SECURITY DATA SUPPLY, LLC et al. | § § § | |
| v. | § § | CASE NO. 3:18-CV-1399-S |
| NORTEK SECURITY AND CONTROL LLC et al. | § § § | |

## MEMORANDUM OPINION AND ORDER

This Order addresses Defendants Earnest Bernard's ("Bernard") Motion to Dismiss [ECF No. 104], Nortek Security and Control LLC's ("Nortek") Motion to Dismiss [ECF No. 106], and Wave Electronics Inc.'s ("Wave") (collectively, "Defendants") Motion to Dismiss [ECF No. 108] (the "Motions"). For the following reasons, the Court grants in part and denies in part the Motions.

### I. BACKGROUND

#### A. *Procedural History*

Plaintiffs Security Data Supply, LLC ("SDS") and its franchisees ("SDS Franchisees") (collectively, "Plaintiffs") filed this lawsuit on October 12, 2017, in the U.S. District Court for the Eastern District of Louisiana alleging violations of the federal antitrust laws and tortious interference. Resp. 1, 4. Defendants moved to dismiss for lack of personal jurisdiction, and the Louisiana District Court transferred the case to this Court on May 31, 2018. *See* ECF No. 62. During a hearing on September 20, 2018, Plaintiffs orally moved for leave to file an amended complaint, which the Court granted. *See* ECF No. 99. After Plaintiffs filed their Second Amended Complaint on October 5, 2018, Defendants again moved to dismiss. *See* ECF Nos. 102, 104, 106, 108. The parties through their counsel appeared before the Court for oral argument on the pending Motions on June 19, 2019.

B.  *Factual History*

Nortek is a leading manufacturer of security, home automation, and personal security systems that distributes its products through wholesale distributors such as SDS. Second Am. Compl. ¶¶ 17-18. Although Nortek maintains a 10% market share of intrusion alarm systems overall, Nortek is the sole manufacturer of 2GIG—"an intelligent connected system for residential intrusion detection." *Id.* ¶¶ 19-20. Nortek sells its products to wholesale distributors, who then sell it to retailers and installers, who provide the equipment to the end user. *Id.* ¶ 18. Nortek manufactures and distributes its 2GIG products from California and Colorado. *Id.* ¶ 37.

Plaintiffs are wholesale distributors of CCTV, intrusion alarm systems, access control, fire alarms, and home automation systems, including Nortek's 2GIG and other products. *Id.* ¶¶ 3-15. Plaintiffs maintain outlets in Texas and Louisiana, and have been distributing Nortek's products since 2004. *Id.* ¶¶ 32-33, 37. Nortek's prices were generally consistent and only varied in limited circumstances, such as when Nortek sold to dealers in extraordinary volume. *Id.* ¶ 44. Plaintiffs contend that SDS and the SDS Franchisees operate as a single enterprise. *Id.* ¶¶ 89-92. SDS and the SDS Franchisees have entered into a "Cost Plus [sic] Contract," whereby the SDS Franchisees purchase all of their inventory from SDS for a set price based upon a standard mark-up on the wholesale price. *Id.* ¶ 90. Thus, "there is a functional or economic unity between SDS . . . and its franchisees." *Id.* ¶ 91. Nortek also treated SDS and the SDS Franchisees as a single enterprise. *Id.* ¶ 92.

Wave began distributing Nortek's 2GIG products in 2015, and has since been Plaintiffs' direct competitor, maintaining outlets in Texas and Louisiana. *Id.* ¶¶ 18, 22-23, 35-37. By 2017, Wave became the largest purchaser of 2GIG products. *Id.* ¶ 38. According to Plaintiffs, this was possible because Nortek and Wave entered into a special pricing program called the "Four Star Program." *Id.* ¶¶ 28, 38. Plaintiffs also interviewed former Wave employees aware of the alleged

2

pricing scheme, who told Plaintiffs that the Four Star Program was designed to attract customers to Wave. *Id.* ¶ 68. This pricing program allegedly involved special rebates that Wave's customers received after the sale was complete. *Id.* ¶ 45. According to Plaintiffs, the rebate was "kicked back" to Wave, which allowed Wave to earn a significant profit while selling Nortek's products up to 40% below the wholesale price Nortek charged Plaintiffs and other distributors. *Id.* ¶¶ 45-46, 97.

Although there were some requirements for a customer to obtain special pricing, Wave provided the special pricing to nearly all of its customers, allegedly with Nortek's tacit consent. *Id.* ¶¶ 47-48. When Plaintiffs inquired about entering into a similar arrangement, Nortek denied the existence of the Four Star Program. *Id.* ¶ 49. Bernard, Nortek's sales representative, purportedly told Plaintiffs that they were receiving Nortek's best price and that all of the distributors were paying the same amount for Nortek's products. *Id.*

Plaintiffs allege that Bernard and other Nortek employees were receiving "bribes . . . consisting of payments and American Express gift cards" from Wave in exchange for maintaining the pricing program. *Id.* ¶¶ 26, 28, 38-39, 53, 70-75. As part of this scheme, Nortek's employees would also identify Plaintiffs' customers to Wave as potential "leads." *Id.* ¶¶ 60-61. Once Nortek learned of these employees' activities, Bernard resigned and the other employees engaged in the alleged bribery were terminated. *Id.* ¶ 54. Nonetheless, Plaintiffs allege that even after Nortek discovered the pricing program and allowed Plaintiffs to provide limited special pricing to a handful of their customers, Nortek continued to give Wave preferential treatment. *See id.* ¶ 62. For example, two days after Plaintiffs had Nortek approve Plaintiffs' longstanding and largest client for special pricing, the client was approached by Wave's branch manager and a Nortek employee about switching to Wave for "even . . . better pricing." *Id.* Nortek also extended

3

Wave's pricing program for an extra sixty days and grandfathered in Wave's top thirty dealers, allowing Wave to maintain an edge over Plaintiffs. *Id.* ¶ 81.

Moreover, Nortek's outside counsel allegedly warned Nortek that the pricing program was illegal. *Id.* ¶ 85. Similarly, Nortek's executives and management allegedly admitted in discussions with Plaintiffs' representatives that the Four Star Program "provided for unfair competition, was illegal and needed to be stopped." *Id.* ¶¶ 76-85. Nortek's sales manager further admitted that allowing Wave to grandfather in thirty of its best dealers was unfair and "would have a detrimental impact upon the relevant market." *Id.* ¶ 81. Despite warnings from internal advisers and outside counsel, Nortek allowed the rebate program to continue until the end of 2017. *Id.* ¶¶ 55-56, 83-87.

Once Nortek phased out the pricing program, Wave entered into a special pricing arrangement with Nortek's competitor, Quolsys. *Id.* ¶ 57. Plaintiffs allege that all of Wave's customers currently purchase Quolsys products instead of Nortek's 2GIG products. *Id.* Although the pricing scheme has stopped, Plaintiffs allege that it injured competition. *Id.* ¶ 93. Plaintiffs allegedly "lost a significant number of customers to Wave, have been unable to compete with Wave for new potential customers and have suffered significant financial losses including the loss of sales, profits and market share." *Id.* ¶ 94. By preliminary estimates, Plaintiffs lost approximately 59 existing clients, or $9,575,000 in "annual losses," and an unspecified number of potential customers. *Id.* ¶¶ 95-98.

Once Nortek began offering Plaintiffs the pricing program, Plaintiffs' sales of 2GIG products increased by 40% between July and December 2017. *Id.* ¶ 99. In January 2018, however, Nortek pulled its products from Plaintiffs without providing them with the contractually required notice. *Id.* ¶ 100. Although Plaintiffs offered to pay all of the outstanding invoices for the unsold

inventory, Nortek refused to accept the return of unsold merchandise and initiated a lawsuit in California seeking the collection of the past due invoices. *Id.* ¶ 101.

In response, Plaintiffs initiated the present action. In Count I against Nortek and in Count II against Wave, Plaintiffs allege that Nortek and Wave violated §§ 2(a) and (f) of the Robinson-Patman Act ("RPA"), 15 U.S.C. §§ 13(a) and 13(f), by knowingly inducing, receiving, or engaging in price discrimination. *Id.* ¶¶ 103-38. In Count III, Plaintiffs allege that Defendants engaged in commercial bribery in violation of RPA § 2(c), 15 U.S.C § 13(c). *Id.* ¶¶ 139-51. Finally, Plaintiffs assert claims for tortious interference in Count IV, against Wave and Bernard, and in Count V,[1] against all Defendants. *Id.* ¶¶ 152-70.

## II.  LEGAL STANDARD

To defeat a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008). To meet this "facial plausibility" standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility does not require probability, but a plaintiff must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The court must accept well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). However, the court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). A

---

[1] There are two sections labeled "Count IV" in the Second Amended Complaint. The Court presumes that this is a numbering error and will refer to the second section labeled Count IV, pleading tortious interference against all Defendants, as Count V.

5

plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted).

The ultimate question is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002). At the motion to dismiss stage, the court does not evaluate the plaintiff's likelihood of success. It only determines whether the plaintiff has stated a claim upon which relief can be granted. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977).

### III. ANALYSIS

#### A. *Standing*

Defendants moved to dismiss the portions of Counts I and II that are asserted by the SDS Franchisees, arguing that the SDS Franchisees lack standing to assert a claim for price discrimination under RPA § 2. Standing in a private antitrust action for damages arises under § 4 of the Clayton Act. *See* 15 U.S.C. § 15; *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981) ("[P]roof of a violation does not mean that a disfavored purchaser has been actually 'injured' within the meaning of § 4."); *Feeney v. Chamberlain Mfg. Corp.*, 831 F.2d 93, 95 (5th Cir. 1987) (analyzing an RPA claim for damages under §§ 4 and 7 of the Clayton Act). "Standing to pursue an antitrust suit [exists] only if [Plaintiffs] show[]: '1) injury-in-fact, an injury to [Plaintiffs] proximately caused by [Defendants'] conduct; 2) antitrust injury; and 3) proper plaintiff status . . . .'" *Waggoner v. Denbury Onshore, L.L.C.*, 612 F. App'x 734, 736 (5th Cir. 2015) (quoting *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir.

1997)). For the following reasons, the Court finds that the SDS Franchisees have standing to assert a violation of RPA § 2.

### (1) *Injury-in-Fact*

A court analyzing antitrust standing must first determine whether Plaintiffs have properly alleged an injury-in-fact to their business or property. *Norris v. Hearst Tr.*, 500 F.3d 454, 465 (5th Cir. 2007) (collecting cases); *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 270 (5th Cir. 1979). A plaintiff successfully shows injury-in-fact by pleading a decline in sales because of the defendant's conduct, but lacks standing if no actual injury has yet occurred because of the defendant's conduct. *Compare Impala African Safaris, LLC v. Dall. Safari Club, Inc.*, Civ. A. No. 3:13-CV-2175-G, 2014 WL 4555659, at *5 (N.D. Tex. Sept. 9, 2014) (finding no standing where no injury had occurred), *with David L. Aldridge Co. v. Microsoft Corp.*, 995 F. Supp. 728, 748 (S.D. Tex. 1998) (finding standing where the plaintiff suffered a "significant decline in sales"). In this case, SDS and its franchisees allege that they lost 59 clients and approximately $9,575,000 in annual revenue because of Defendants' discriminatory pricing program. *See* Second Am. Compl. ¶¶ 95-96. Accordingly, the SDS Franchisees sufficiently pleaded an injury-in-fact.

### (2) *Antitrust Injury*

The Supreme Court has described antitrust injury as:

> [I]njury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause."

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (alteration in original) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125 (1969)); *Waggoner*, 612 F. App'x at 737. There are three categories of competitive injuries that can give rise to an RPA claim:

> Primary-line cases entail conduct—most conspicuously, predatory pricing—that injures competition at the level of the discriminating seller and its direct competitors. Secondary-line cases, of which this is one, involve price discrimination that injures competition among the discriminating seller's customers (here, [Plaintiffs and Wave]); cases in this category typically refer to "favored" and "disfavored" purchasers. Tertiary-line cases involve injury to competition at the level of the purchaser's customers.

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176 (2006) (citations omitted); *Water Craft Mgmt. LLC v. Mercury Marine*, 457 F.3d 484, 487 n.2 (5th Cir. 2006). "A hallmark of the requisite competitive injury [in a secondary-line case] . . . is the diversion of sales or profits from a disfavored purchaser to a favored purchaser." *Volvo Trucks*, 546 U.S. at 177 (collecting cases). Here, the Complaint is replete with allegations of the diversion of sales and profits from Plaintiffs to Wave. Plaintiff alleged that the discriminatory pricing program allowed Wave to win 59 clients and $9,575,000 in annual revenue from Plaintiffs. *Id.* ¶¶ 94-99. The Complaint thus contains allegations showing the hallmark of the requisite competitive injury. Additionally, Plaintiffs pleaded the existence of significant discriminatory pricing that allowed Wave to sell Nortek products up to 40% below the wholesale price Nortek charged Plaintiffs, *see* Second Am. Compl. ¶¶ 46, 97, which alone may be sufficient to show injury. *See FTC v. Morton Salt Co.*, 334 U.S. 37, 46-47 (1948) (suggesting that the requisite injury can be inferred from a significant price discrimination alone); *Hanson v. Pittsburgh Plate Glass Indus., Inc.*, 482 F.2d 220, 227 (5th Cir. 1973) (same).

Defendants argue that, under *Security Tire & Rubber Co. v. Gates Rubber Co.*, the SDS Franchisees have not suffered an antitrust injury because the SDS Franchisees obtained their inventory only through transfers from SDS, and "transfers from a parent corporation to its wholly-owned subsidiary corporation can never be considered separate sales . . . in a[n] [RPA] discrimination suit." 598 F.2d 962, 965 (5th Cir. 1979). *Security Tire* is inapposite here. In *Security Tire*, the only evidence of price discrimination was the fact that the defendant favored its

8

wholly-owned subsidiary over the plaintiff. *See* 598 F.2d at 964-65. The Fifth Circuit held that a defendant's transfer of goods to a wholly-owned subsidiary would not constitute a "favored sale" for the purposes of the RPA. *Id.* at 965. Nothing in *Security Tire* suggests that a plaintiff who otherwise suffered an antitrust injury is precluded from alleging a violation of the RPA solely because the plaintiff obtained its inventory from a parent corporation.[2] Accordingly, the Court finds that the SDS Franchisees adequately pleaded an antitrust injury.

### (3) *Proper Plaintiff Status*

Finally, the Court must consider whether the SDS Franchisees are "proper plaintiffs" to sue for damages. To this end, the Court must consider: "(1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment." *Norris*, 500 F.3d at 465 (quoting *McCormack v. NCAA*, 845 F.2d 1338, 1341 (5th Cir. 1988)).

Defendants assert that the SDS Franchisees are not proper plaintiffs because they received their inventory from SDS, not from Defendants. In general, only the direct purchaser of goods will have standing to assert an antitrust violation. *See Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019) (citing *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 745-46 (1977)); *Free v. Abbott Labs., Inc.*, 176 F.3d 298, 299 (5th Cir. 1999) (same). This indirect purchaser rule does not apply, however, in the "cost-plus" contract setting. *See In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1163-66

---

[2] To the extent that Defendants intended to argue that Plaintiffs failed to adequately plead an essential element of a price discrimination claim under the RPA—two separate and contemporaneous sales to two distinct purchasers—Defendants are incorrect. The allegations in *Security Tire* were deficient because the defendants in that case "did not make a sale to two buyers at the same level of competition" and so the plaintiff "could not have suffered secondary-line injury." *Eximco, Inc. v. Trane Co.*, 737 F.2d 505, 517 (5th Cir. 1984) (discussing *Security Tire*). Here, however, Plaintiffs adequately pleaded two separate and contemporaneous sales to direct competitors: Wave, which is a corporation that is not Nortek's subsidiary, and Plaintiffs, which are limited liability companies that are not Nortek's subsidiaries. Am. Compl. ¶¶ 3-23, 38, 45, 49, 68, 97.

(5th Cir. 1979). In a cost-plus contract, the purchaser "commit[s] to buy[] a fixed quantity regardless of price," such that "[t]he effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand." *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 217 (1990) (quoting *Ill. Brick*, 431 U.S. at 736). A purchaser can plead "the functional equivalent of cost-plus contracts" by showing that the price of a good was determined "by strictly applying certain formulae to the . . . wholesale . . . price."[3] *In re Beef*, 600 F.2d at 1165; *see also In re Plywood Antitrust Litig.*, 655 F.2d 627, 640 (5th Cir. Unit A Sept. 1981). As a result, the purchaser and the middleman incur "wholly separable items of damage"—the middleman loses volume while the purchaser absorbs the overcharge. *In re Beef*, 600 F.2d at 1164.

The Court finds that Plaintiffs adequately pleaded that, at a minimum, the SDS Franchisees have the functional equivalent of a cost-plus contract with SDS. The Complaint alleges that "[e]ach of the SDS Franchisees have entered into a franchise agreement where they purchase 100% of their products through [SDS] for a set price based upon a standard mark up [sic] on the wholesale price provided to [SDS] from the manufacturer." Second Am. Compl. ¶ 90. As a result, any overcharge "is not absorbed by SDS," but "is passed directly to [the SDS Franchisees]." *Id.* Accepting these allegations as true, the Court finds that the SDS Franchisees have a cost-plus contract with SDS and are, therefore, proper plaintiffs to allege price discrimination under the RPA.

---

[3] Some circuits adopted a narrow interpretation of the cost-plus exception in light of *Kansas v. UtiliCorp United. See* EARL W. KINTNER ET AL., 11 FEDERAL ANTITRUST LAW § 78.8(c)(3) (collecting cases). To date, however, neither the Fifth Circuit nor the Supreme Court has overruled *In re Beef*.

10

### B. *Count III: Commercial Bribery*

#### (1) *Viability of the Claim under the RPA*

Defendants contend that Count III must be dismissed because commercial bribery is not a violation of RPA § 2(c). The Court disagrees for several reasons. First, although the Fifth Circuit has not decided whether commercial bribery constitutes a violation of the RPA, *see Excel Handbag Co. v. Edison Bros. Stores, Inc.*, 630 F.2d 379, 387-88 (5th Cir. 1980) (declining to reach the issue), every circuit to have addressed the issue has held that commercial bribery can amount to a violation of RPA § 2(c). *See Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 372 (3d Cir. 1985) (observing that "[t]here is good reason to question whether Congress intended to sweep commercial bribery within the ambit of section 2(c)," but joining the other "three Court of Appeals[,] which found that certain events constituting commercial bribery came within the terms of 2(c)" (citations omitted)); *Grace v. E.J. Kozin Co.*, 538 F.2d 170, 173 (7th Cir. 1976) ("[A]lthough defendants argue that Section 2(c) of the [RPA] does not reach commercial bribery cases such as this, we agree with the Sixth and Ninth Circuits that it does." (citations omitted)); *Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674, 696 (9th Cir. 1976) ("We hold that, if distributor is able on remand to prove that counterdefendants indeed committed acts of commercial bribery in violation of [§] 2(c), then the defendants ought to be allowed any damages proximately caused by that violation."); *Fitch v. Ky.-Tenn. Light & Power*, 136 F.2d 12, 15 (6th Cir. 1943) ("[T]he statute makes it illegal to make such a payment"—a bribe—"either to the other party to the transaction or to an agent or representative of such party." (internal quotation mark omitted)). In the absence of Fifth Circuit precedent, the Court finds it reasonable to rely on persuasive authority from the sister circuits. *See United States v. Graves*, 908 F.3d 137, 142 (5th Cir. 2018) ("We are always chary to create a circuit split." (quoting *Alfaro v. Comm'r*, 349 F.3d 225, 229 (5th Cir. 2003))).

Second, commercial bribery that involves a "person engaged in commerce" who "pay[s] or grant[s], or . . . receive[s] or accept[s]" while "in the course of such commerce . . . anything of value as a commission . . . or . . . any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods" appears to come within the plain language of § 2(c). 15 U.S.C. § 13(c). Third, the sister circuits' decision to recognize commercial briber as a violation of § 2(c) appears to fulfill the legislative purpose of the RPA, which is "to prevent sellers . . . from yielding to the economic pressures of a large buying organization by granting unfair preferences in connection with the sale of goods." *FTC v. Henry Broch & Co.*, 363 U.S. 166, 174 (1960). Commercial bribery is one avenue large buying organizations may employ to gain such an unfair advantage and divert profits from the rival buyer to the payer of the bribe, which is the hallmark of anticompetitive injury in RPA cases. *See Volvo Trucks*, 546 U.S. at 177. Finally, the Supreme Court suggested, in dictum, that "bribery of a public purchasing agent may constitute a violation of [§] 2(c)."[4] *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972).

For these reasons, the Court finds that commercial bribery may amount to a violation of RPA § 2(c).

### (2) *Sufficiency of the Allegations*

Having determined that commercial bribery is actionable under § 2(c), the Court now turns to analyzing whether the Complaint sufficiently states such a claim. The Fifth Circuit has suggested that a claim for commercial bribery under the RPA requires a plaintiff to establish an

---

[4] The Court also notes that leading treatises and practice guides agree that § 2(c) prohibits commercial bribery. *See, e.g.*, 14 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 2632i (3d ed. 2012) ("[RPA § 2(c)] was intended to cover some practices that could be described as 'commercial bribery.'"); CORPORATE COUNSEL'S GUIDE TO ROBINSON-PATMAN ACT § 3:13 (2018) ("In addition to the various state statutes, federal laws also proscribe commercial bribery, such as the [RPA], otherwise known as the price discrimination law.").

underlying commercial bribery offense. *See Excel Handbag Co.*, 630 F.2d at 386, 387-88 (holding that the RPA § 2(c) claim premised on commercial bribery failed because the counterclaimant did not establish these elements). The offense of commercial bribery generally has the following elements: (1) the giving or offering of something of value; (2) to an agent or fiduciary; (3) without the consent of the principal; (4) with intent to influence the conduct of the agent or the fiduciary.[5] *See, e.g., Perrin v. United States*, 444 U.S. 37, 39 n.3 (1979) (discussing commercial bribery under the Travel Act, 18 U.S.C. § 1952); *Nyakatura v. Att'y Gen.*, 256 F. App'x 461, 466 (3d Cir. 2007) (discussing the common law definition of commercial bribery); *In re DePuy Orthopaedics, Inc.*, MDL Dkt. No. 3:11-MD-2244-K, 2016 WL 6271465, at *6 (N.D. Tex. Jan. 5, 2016) (same under Texas law); AREEDA & HOVENKAMP, *supra*, ¶ 2362i (same under the RPA); *see also* MODEL PENAL CODE § 224.8 (AM. LAW INST. 1985) (proposing elements); *Commercial Bribery*, BLACK'S LAW DICTIONARY (11th ed. 2019). Both the payor and the payee can commit commercial bribery. *See, e.g., Samsung Elecs. Am., Inc. v. Yang Kun Chung*, Civ. A. No. 3:15-CV-4108-D, 2017 WL 635031, at *6 (N.D. Tex. Feb. 16, 2017). Additionally, to state a claim under the RPA, a plaintiff must plead injury and causation under § 4 of the Clayton Act. *See Grace*, 538 F.2d at 173-74.[6]

### a. *Nortek*

Plaintiffs did not allege that Nortek offered, accepted, or paid bribes; to the contrary, the Complaint affirmatively states that Nortek did not consent to the bribery. *See* Second Am. Compl. ¶¶ 54, 155, 163. Nor could Nortek, a principal, be principally liable for commercial bribery, which involves the corruption without the consent of the principal. *See Perrin*, 444 U.S. at 39 n.3; *In re*

---

[5] These elements are consistent with the language of § 2(c). *See* 15 U.S.C. § 13(c).

[6] To the extent that the alleged bribe needs to cross the seller-buyer line—*i.e.*, where the payment is paid "by the [buyer] with the intent to improperly influence or corrupt" the seller's conduct, *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 222 (2d Cir. 2004); *Seaboard Supply Co.*, 770 F.2d at 372, the Court finds that Plaintiffs satisfied this requirement by pleading that Wave, the buyer, paid the bribe to Nortek's agents, the seller. *See* Second Am. Compl. ¶¶ 59-75.

13

*DuPuy*, 2016 WL 6271465, at *6; *see also Grace*, 538 F.2d at 173 (explaining that the purpose of § 2(c) of the RPA "is to protect the integrity of the principal-agent relationship").

Plaintiffs asserts that if Nortek cannot be held principally liable for the commercial bribery, it may be held vicariously liable. *See* Pls.' Supp. Br. 1-4. The Court agrees with this argument. *See, e.g., Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 569, 572-73 (1982) (imposing vicarious liability for antitrust violations). Thus, although the Court grants Nortek's Motion as to the direct commercial bribery claim against Nortek, the Court denies the Motion as to the vicarious liability claim.

### b. *Bernard*

Bernard contends that Plaintiffs did not plead with specificity under Federal Rule of Civil Procedure 9(b) that Bernard engaged in commercial bribery. In general, courts do not impose a higher pleading standard for RPA claims, *see Larry R. George*, 587 F.2d at 270, *Games People Play, Inc. v. Nike, Inc.*, Civ. A. No. 1:14-cv-321, 2015 WL 13657672, at *2-3 (E.D. Tex. Feb. 13, 2015), but require a plaintiff to plead the offense of commercial bribery with specificity under Rule 9(b). *See In re DePuy*, 2016 WL 6271465, at *6-7. Under Rule 9(b), a complaint must set out "the essentials of the first paragraph of a newspaper story, namely the who, what, when, where, and how." *Melder v. Morris*, 27 F.3d 1097, 1100 n.5 (5th Cir. 1994) (citation omitted).

Even if the Rule 9(b) standard applies, the Court finds that Plaintiffs pleaded Bernard's involvement in commercial bribery with specificity. The Complaint sets forth sufficient facts showing that Bernard was Nortek's sales representative, who received bribes from Wave in the form of payments and American Express gift cards. *See* Second Am. Compl. ¶¶ 25, 26, 28, 53, 59, 70. There are numerous facts pleaded that show that Bernard provided low, discriminatory pricing to Wave in exchange for these payments. *Id.* ¶¶ 26, 49, 53, 70, 112, 143-45, 150, 154. Plaintiffs even pleaded the alleged method of calculation of the bribe and the method of delivery,

14

based on testimony of a former Wave employee and other documentation. *Id.* ¶¶ 64-65, 69-70 & Ex. D. Viewing the Complaint in the light most favorable to Plaintiffs, the Court finds that Plaintiffs adequately alleged that Bernard engaged in commercial bribery.

####       c.    *Wave*

Wave argues that Plaintiffs did not sufficiently plead commercial bribery for two reasons. First, Wave contends that the allegations are not plausible and "make[] no sense," because: "If Nortek would give the discounts anyway, there would have been no reason or purpose in Wave's bribing Bernard." Wave's Br. 5. The Court, however, does not evaluate Plaintiffs' likelihood of success at trial in the context of a motion to dismiss, but decides only whether the Complaint states a valid claim, which it does here. *See Great Plains Tr.*, 313 F.3d at 312. Second, Wave asserts that Plaintiffs did not plead that Bernard and Nortek's other employees acted "for or in [sic] behalf of" Nortek; rather, Wave contends, Plaintiffs affirmatively pleaded that Nortek was unaware of the alleged bribe. *See generally* Wave's Suppl. Br. The Court finds this argument unpersuasive. Commercial bribery, by definition, involves "*secret* payments to an agent," *Excel Handbag*, 630 F.2d at 386 (emphasis added), without the consent of the principal, *see supra* § III.B.2 (collecting authorities). Plaintiffs' allegations here are sufficient, because they alleged that Nortek's employees accepted bribes without Nortek's consent. *See* Second Am. Compl. ¶¶ 25-26, 28, 52-54, 155, 163.

### C.    *Tortious Interference*

Defendants contend that the Complaint fails to state a claim for tortious interference with existing contracts, prospective business relationships, or existing business relationships.

####    (1)    *Tortious Interference with Existing Contract*

"The elements of a tortious interference with contract claim are: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) such act was a

proximate cause of damage; and (4) actual damage or loss occurred." *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 864 (5th Cir. 2004) (citation omitted). "To prevail on a claim for tortious interference with an existing contract, [Plaintiffs] ha[ve] to present evidence that [Defendants] induced [a third party] to 'breach the contract.'" *El Paso Healthcare Sys., Ltd. v. Murphy*, 518 S.W.3d 412, 421-22 (Tex. 2017). The Complaint does not include any facts showing that Defendants induced any party to breach a contract. Accordingly, the Court grants the Motions as to Counts IV and V insofar as these Counts plead tortious interference with an existing contract. However, because Plaintiffs requested in their Response for leave to plead additional facts to support their claims, the Court will permit them to replead.

### (2) *Tortious Interference with Prospective Business Relations*

> The elements of a claim for tortious interference with prospective business relations are 1) a reasonable probability that the parties would have entered into a contractual relationship; 2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; 3) the defendant acted with a conscious desire to prevent the relationship from occurring, or it knew that the interference was certain or substantially certain to occur as a result of his conduct; and 4) the plaintiff suffered actual harm or damage as a result of the defendant's interference.

*Ewbank v. ChoicePoint Inc.*, 551 F. Supp. 2d 563, 566-67 (N.D. Tex. 2008) (citing *Raj Partners, Ltd. v. Darco Constr. Corp.*, 217 S.W.3d 638, 649 n.10 (Tex. App.—Amarillo 2006, no pet.); *Richardson-Eagle, Inc. v. William. M. Mercer, Inc.*, 213 S.W.3d 469, 475 (Tex. App.—Houston [1st Dist.] 2006, pet. denied)). Defendants only challenge the first two elements of this claim.

To establish a reasonable probability of a future business relationship, "a plaintiff must prove that more than mere negotiations occurred." *Richardson-Eagle*, 213 S.W.3d at 475 (citing *Milam v. Nat'l Ins. Crime Bureau*, 989 S.W.2d 126, 132 (Tex. App.—San Antonio 1999, no pet.). A "pre-existing business relationship can suffice to show a reasonable probability of prospective contractual relations," *Santander Consumer USA, Inc. v. Zeigler Chrysler Dodge Jeep-Downers Grove, LLC*, Civ. A. No. 3:16-cv-3310-B, 2017 WL 2729998, at *9 (N.D. Tex. June 26, 2017)

(citation omitted), provided that the pre-existing business relationships is an ongoing contractual relationship. *See N. Cypress Med. Ctr. Operating Co. v. Gallagher Benefit Servs., Inc.*, Civ. A. No. 11-CV-00685, 2012 WL 2870639, at *7 (S.D. Tex. July 11, 2012).

Here, Plaintiffs pleaded tortious interference with at least two business relationships that were beyond the negotiations stage. First, the Complaint states that Plaintiffs had a long, ongoing relationship with Nortek; that due to Bernard and Wave's rebate program, Plaintiffs lost market share of Nortek's products; and that Nortek pulled other related product lines from Plaintiffs. *See* Second Am. Compl. ¶¶ 38, 42, 100. Second, the Complaint alleges that Nortek and Wave contacted Plaintiffs' longstanding client to encourage it to switch to Wave. *Id.* ¶ 62. Moreover, this allegedly occurred after Plaintiffs had Nortek approve special pricing terms for the client, which suggests that Plaintiffs reached or were close to reaching an agreement with the client. *Id.* Viewing the Complaint in the light most favorable to Plaintiffs, the Court finds that these allegations are sufficient to establish a reasonable probability of a future business relationship.

As for pleading an independently tortious or unlawful act, Plaintiffs must show that Defendants engaged in conduct that is more than "merely 'sharp' or unfair"—it must be "actionable under a recognized tort [theory]." *Centuria, Inc. v. Regiment Sec., LLC*, Civ. A. No. 3:11-CV-2500-N, 2013 WL 12250941, at *2 (N.D. Tex. Jan. 11, 2013) (alteration in original) (quoting *Ash v. Hack Branch Distrib. Co.*, 54 S.W.3d 401, 414-15 (Tex. App.—Waco 2001, pet. denied)). A violation of the antitrust laws suffices as an independently tortious or wrongful act. *See In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 704-06 (Tex. 2015). As explained above, Plaintiffs adequately alleged that Defendants engaged in violations of the RPA. Accordingly, the Court finds that Plaintiffs sufficiently stated a claim for tortious interference with a prospective business relationship.

### (3) *Tortious Interference with Existing Business Relationships*

"To the extent that Texas recognizes a cause of action for tortious interference with an existing business relationship, its elements are: '(1) unlawful actions undertaken by [Defendants] without a legal right or justifiable excuse; (2) with the intent to harm [Plaintiffs]; and (3) resulting actual harm or damage.'" *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 214-15 (5th Cir. 2018) (footnote omitted) (quoting *Am. Med. Int'l, Inc. v. Guirintano*, 821 S.W.2d 331, 335 (Tex. App.—Houston [14th Dist.] 1991, no writ)). The unlawful act requirement is satisfied by showing that the defendant engaged in conduct that is "independently tortious or unlawful." *Adrain v. Genetec Inc.*, No. 2:08-CV-423, 2009 WL 3161386, at *3 (E.D. Tex. Sept. 30, 2019). Additionally, Plaintiffs must show that Defendants' interference was motivated by malice, but do not need to allege the existence of a contract subject to interference. *Id.* at 215 (quoting *CF & I Steel Corp. v. Pete Sublett & Co.*, 623 S.W.2d 709, 715 (Tex. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). In the tortious interference context, malice "is 'not to be understood in its proper sense of ill will against a person, but in its legal sense, as characterizing an unlawful act, done intentionally without just cause or excuse.'" *Montoya v. San Angelo Cmty. Med. Ctr.*, No. 03-16-00510-CV, 2018 WL 2437508 (Tex. App.—Austin May 31, 2018, pet. denied) (quoting *Exxon Corp v. Allsup*, 808 S.W.2d 648, 659 (Tex. App.—Corpus Christi 1991, writ denied)).

Defendants argue that Plaintiffs did not sufficiently plead that they engaged in an unlawful act or that they acted with malice. As previously discussed, Defendants allegedly engaged in violations of the RPA, which satisfies the unlawful act element of the claim. The Court further finds that Plaintiffs sufficiently pleaded that Defendants acted intentionally and without just cause or excuse. The Complaint states that Defendants knew of Plaintiffs' customers and business relationships, knew or should have known that their conduct was illegal or wrongful, knew that Plaintiffs were losing customers, and acted despite this knowledge. *See* Second Am. Compl. ¶¶ 29,

18

54, 60-61, 76, 154, 162. Accordingly, the Court finds that Plaintiffs sufficiently pleaded a claim for tortious interference with existing business relationships.

### (4) *Civil Conspiracy*

Wave asks the Court to dismiss Plaintiffs' claim for civil conspiracy or to strike these allegations under Federal Rule of Civil Procedure 12(f).[7] Defendants can be held jointly and severally liable if they were part of a conspiracy and one of them committed an underlying tort. *See Shaw v. Karnes Cty.*, Civ. A. No. SA-16-CA-203-FB, 2017 WL 6403052, at *2-3 (W.D. Tex. Sept. 28, 2017) (noting that a civil conspiracy claim creates at least derivative liability). To create derivative liability, Plaintiffs must establish the following elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Wackman v. Rubsamen*, 602 F.3d 391, 408 (5th Cir. 2010) (internal quotation marks omitted) (quoting *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005)).

Here, the Court finds that Plaintiffs successfully pleaded facts to support a claim of civil conspiracy when viewed in the light most favorable to Plaintiffs. For example, Bernard and Wave allegedly conspired to foster the discriminatory pricing program in exchange for bribes, which harmed Plaintiffs' ability to retain clients. *See, e.g.*, Second Am. Compl. ¶¶ 26, 28-29, 53. The Complaint also states that Nortek and Wave allegedly jointly solicited Plaintiffs' clients to switch to Wave. *See id.* ¶ 62. Plaintiffs' allegations are facially plausible and sufficient to show that Defendants conspired to commit one or more unlawful, overt acts, which harmed Plaintiffs. Accordingly, the Court denies the Motions as to the civil conspiracy allegations.

---

[7] At the hearing on June 19, 2019, counsel for Plaintiffs clarified that they are not alleging an independent claim for civil conspiracy.

## IV. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the Motions. The Court grants the Motions as to Counts IV and V insofar as these counts allege claims for the tortious interference with an existing contract. The Court also grants Nortek's Motion as to a direct commercial bribery claim under Count III, but denies the Motion as to a vicarious liability claim. The Court otherwise denies the Motions. The Court grants Plaintiffs' request for leave to amend. Plaintiffs must file an amended complaint no later than August 21, 2019. If an amended complaint is not filed by this date, the dismissed claims will be dismissed with prejudice.

**SO ORDERED.**

SIGNED July 22, 2019.

*/s/ Karen Gren Scholer*
**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**